# Gass and others' Appeal.

1. A German Reformed congregation and a Lutheran congregation built a church together, in which by their articles of association "Divine Service" only was to be held; for many years there were no meetings in it except for public worship: *Held*, under the facts in this case, Sabbath Schools were not included in "Divine Service."

2. The meaning of "Divine Service," like a word of art, is to be determined by the sense in which it was used by the parties.

3. Courts must interpret written instruments, but they follow the meaning attributed to the terms by those whose custom it is to use them.

4. Where a contract may have two interpretations courts will follow that which the parties have put upon it and acted upon.

5. Two congregations built a church for their joint use in Divine Service; against the protest of one and their articles of association, the other introduced a Sabbath School into the church. *Held*, that equity had jurisdiction to restrain the latter congregation.

6. Parties in such case are not governed by the ordinary rules of a tenancy in common.

January 31st 1873.    Before READ, C. J., AGNEW, WILLIAMS and MERCUR, JJ.    SHARSWOOD, J., at Nisi Prius.

Appeal from the Court of Common Pleas of *Northumberland county*: In Equity: Of September Term 1872.

This was a bill filed December 5th 1870, by Joseph Gass and Charles Haas, deacons; Joseph Gass and Philip Renn, elders; and George Keefor, trustee, of the German Reformed Church and Congregation of Lower Augusta, against Joseph Emerick, trustee; Rev. L. G. Eggers, pastor; and John Sterner, superintendent of Sabbath School; Abraham Sterner and Alexander Zartman, deacons; and Daniel Zartman and Jacob Beck, elders, of the Evangelical Lutheran Church and Congregation of Lower Augusta.

The object of the bill was to restrain the defendants from using a church building held for both congregations by "transferring to the said church the Sunday school, or using the same for the purpose of holding therein a Sunday school, or for any other purpose not stipulated in the articles of association."

The articles of association were as follows:—

"Pursuant to an agreement, the members of the German Reformed and Evangelical Lutheran churches, in the vicinity of Samuel Lantz's, Lower Augusta township, Northumberland county, Pennsylvania, assembled together in Mr. Samuel Lantz's schoolhouse, on the 5th day of June 1847, for the erection of a German Reformed and Evangelical Lutheran church, on the east side of Mr. Michael Arnold's lot, on the property of Mr. Samuel Lantz, now the property of Mr. John Sterner. It was agreed to erect a brick building, 40 by 35 feet, at one side, with a gallery. The members came together again, and after, on each side, church councils were chosen and were consecrated by the ministers, they

[Gass's Appeal.]

formed themselves into congregations, and on the 8th of April 1848, agreed on the following articles:—

"Art. 1. The church to be erected shall be and remain a German Reformed and Evangelical Lutheran church, under the name of 'Emanuel's Church.'

"Art. 2. No preacher can serve as pastor of this church who is not a member of the German Reformed or Evangelical Lutheran Synod, and a supporter of the so-called old measures.

"Art. 3. It shall be allowed to any member of both congregations, in case of a funeral, to choose the preacher, and it shall be allowed the preacher to deliver the funeral sermon in the church.

"Art. 4. If any one, who is no member of the congregation, desires to have his dead buried in the burying-ground, he shall always ask permission of the trustees, and it shall then be allowed to each minister, of good standing, to deliver the funeral sermon in the church.

"Art. 5. Each congregation shall elect its own preacher, by a majority of the male members who are present.

"Art. 10. No one can be a member of this congregation who does not subscribe to this canon law.

"Art. 11. The preachers of this congregation, if required by the church council, must subscribe to this canon law.

"Art. 12. This canon law shall be read at least once a year, by the minister in charge.

"Art. 13. Each congregation shall have equal right to the property of the church, and each pastor shall so arrange his divine service, as not to interfere with the pastor of the other denomination.

"Art. 15. It shall be allowed to hold divine service in two languages, in English and German; but German divine service shall be held, from time to time, as long as there are four members who desire it."

The bill set out:—

1. The articles of association, and averred that by their stipulations the church "was to be used by each congregation for *Divine Service*."

2. "Divine Service," at the time of the articles, was and always since had been understood to be "the regular preaching service of the respective congregations."

3. In addition to the articles, it was agreed at the time of building that the church was not to be used by either congregation for Sunday Schools or any purposes, except funeral services and the regular preaching services.

4. The practice, for a long time after the church was erected, proved that only the regular preaching services of the church were intended by the term "Divine Service."

5. Until recently the church had never been opened or used for

other purposes than those above named; the Sunday Schools were held in a school-house near the church, and upon the supposition that only the regular services of preaching were to be-held in the church, the citizens built, and afterwards repainted, papered and otherwise improved the interior of the church.

6. John Sterner, a defendant, "in violation of the said usage, understanding and agreement, has transferred his Sabbath School, or the Sabbath School of the Lutheran congregation into the church, and against the consent, and in opposition to the protests of the German Reformed congregation, and the covenants and well-established uses to which the said church had been dedicated and used."

7. Averred damage by the children of the school bringing dirt into the church, defacing and otherwise injuring the church, and making it in a great degree unfit for holding the regular "Divine Service," for which it was intended.

8. The defendants, after notice to cease the use of the church for Sabbath Schools, continued to so use it, "to great annoyance, damage and inconvenience of the plaintiffs, and of the German Reformed Church and congregation."

The prayer was for an injunction to restrain the defendants as above stated, and for further relief.

The defendants answered, that by virtue of the articles of association between the above congregations, the Lutherans have the right to hold this Sabbath School in the said church, providing that they will not interfere with the German Reformed Sabbath Services. That Divine or God's Service, in accordance with the translation from the German into the English, does include Sabbath Schools.

The case was referred to L. W. Kase as examiner and master.

The articles of association were in the German language; the word which was translated "Divine Service" was "Gottesdienst."

For the plaintiffs: J. J. Reimensnyder testified that in his opinion the word "includes all that belongs to the preaching of a sermon, such as singing and prayer, reading of the text, &c., * * * I don't think that the word 'Gottesdienst' could be translated literally 'Public Worship.' From the reading of the 13th article I would say the words 'Divine Service' in it meant preaching."

Philip Renn testified: "The understanding at the time this canon law was signed was nothing very particularly but that the church was to be used by both congregations, so as as not to interfere with the regular times for preaching of each, except one thing; there was nothing else to go on but preaching, and that is what I call 'Divine Service.' Nothing said at the time about Sunday Schools. None in existence in the county at the time to my knowledge. It was talked over, and understood that there

were to be no prayer meetings; no night meetings to be held in the church; nothing to be held in the church but preaching; it was considered catechising was a part of the Divine Service, and it has been held ever since, and this was stipulated at the time to be held in the church in both languages. I think the people put the construction upon the words 'Divine Service' that it was preaching service. This was never disputed until about two years ago, that the preaching service was the only service to be held in the church. An effort was then made to put a Sunday School in the church; both congregations objected because the church was not built for that purpose. The effort was then abandoned, and when this last effort was made the Lutheran congregation put their Sunday School in against the protest of the German Reformed congregation."

There was other evidence on behalf of the plaintiffs corroborating the foregoing as to the understanding of the parties and the practice in the use of the church.

The defendants called Rev. S. J. Milliken, a Presbyterian minister, who testified that he could not read the German language; "In the more extensive use of the, term, 'Divine Service' includes the performance of any duty running out of our obligations to God; in the more restricted sense, acts of religious worship. My translation of '*Divine Service*' or '*God Service*' would include Sabbath Schools: I do not think the service of the Sabbath School conducted by any Evangelical Church would be in violation of the words '*Divine* or God Service."

Rev. Mr. Hemperly, a minister of the Lutheran church, testified, that he had some understanding of the German. "I understand by '*Divine or God Service*' all the exercises of a worshipful character practised in the denominations. A Sabbath School would come within the above definition most emphatically."

The defendants gave evidence that there had been no injury done by the scholars to the church since the school went into the building, and that regulations had been made by the authorities of the school to prevent injury.

The master reported:    *    *    *

"The bill and evidence in the case presented substantially the following state of facts:

"1. That in the years 1847 and 1848, the German Reformed and Evangelical Lutheran congregations of Lower Augusta erected a church under the name of Emanuel's Church, each congregation having an equal right of property therein.

"2. That each congregation was to regulate its divine service and church government in accordance with the articles of association between the two congregations, dated April 8th 1848.

"3. That divine service only was to be held in the said church.

Each congregation so to arrange its divine service as not to interfere with that of the other.

"4. That by the common understanding of both congregations no meetings other than those for divine service could be held in said church.

"5. That funerals and funeral services, by members of both congregations, in the said church, were a right reserved to the members of each respectively, and to those who were not members by asking the consent of both congregations.

"6. That for a period of over twenty years no other meetings than those for public worship, or preaching the Gospel, were held in the said church.

"7. That a Union Sabbath School, organized and kept up by both congregations, was for a number of years held in the schoolhouse close by the said church.

"8. That the Lutheran congregation a short time ago withdrew from the said Union Sabbath School, and established a Sabbath School of their own, under Lutheran officers, in the audience-room of the said church.

"9. That the dividing of said Union Sabbath School, and the establishing of a Lutheran Sabbath School in said church, was done in opposition to and without the consent of the German Reformed congregation.

"The difficulty between the two congregations is caused by the respondents holding a Sabbath School in the church, the property of both congregations, in opposition to the protests of the complainants, and as they allege in violation of the article of agreement under which it was built.

"The case seems in some measure to rest upon the construction given the words, 'Divine Service.' * * * Divine Service, from information derived from the testimony, and as understood by the master, signifies a special service purely of a religious character, dedicated to God, such as singing and prayer, preaching the gospel, praise and adoration, thanksgiving and the like, and would also, in the master's opinion, include Sabbath Schools, properly conducted, singing and prayer, praise and adoration, thanksgiving, &c., are a part of the services in these schools. The young are taught the Scriptures and other religious instruction, and in this way early in life, lead to praise, adore and worship God. Any service of a religious character having for its object the promotion of God's Holy cause, would be divine service, and the term in its broad and most comprehensive sense would certainly include the Sabbath Schools of the present day.

"But in what sense did members of these two congregations, upwards of twenty years ago, at the time the articles of association were entered into, hold divine service to be? Sabbath Schools, as it appears from the testimony, were not in existence in that neigh-

borhood, nor even thought of at that time. Surely the strong inference is, that the only service contemplated, talked over and agreed upon by them, was 'a 'preaching service;' and this inference is made doubly strong from the fact, that from that time up to within a year or two of the present, both congregations have rigidly adhered to this view of the case, always maintaining that preaching the gospel only could be allowed in the church. Singing schools, prayer meetings and the like, were forbidden the use of the church. Only two years ago an attempt to hold a Sabbath School in this church failed upon the ground that it was unauthorized by the articles of association, a position taken at that time by members of both congregations. I am satisfied from the articles of association and the testimony in the cause, that preaching the gospel only, was what was understood by the members of both congregations, to be the divine service, mentioned in the articles of association at the time they were written ; and it seems to me, therefore, that they must be binding upon the parties now, in the sense they were then understood, they were adopted as their ' canon law,' and the pastors in charge enjoined to read them at least once a year to their respective congregations. Trustees, one from each of the said congregations, were to be elected annually, in whose care the church property was intrusted. The choosing of their respective pastors, deacons, elders, terms of preaching, stipulating especially for the holding of *divine service in both the English and German language,* are all regulated by these articles of association, or ' canon law.' .

" The master therefore, after a careful consideration of all the testimony in the cause, is of the opinion that the defendants (the Lutheran congregation) can claim no right under the articles of association, nor from the established uses of the church, to hold a Sabbath School within the body of said church, and therefore recommends an order or decree restraining the respondents from using the said church for the purpose of holding a Sabbath School therein."

Exceptions were filed to the report of the master : the court (Rockefeller, P. J.) sustained the exceptions and decreed that the bill be dismissed with costs.

The plaintiffs appealed to the Supreme Court and assigned the decree of the court for error.

*S. P. Wolverton* (with whom was *T. H. Purdy*), for appellants.

*G. W. Ziegler,* for appellees.

The opinion of the court was delivered, March 27th 1873, by

AGNEW, J.—This bill on behalf of a German Reformed congregation, was to enjoin an Evangelical Lutheran congregation

from holding Sunday schools in the church building. These congregations built a church for common use, and on the 8th of April 1848, adopted a " canon law," as they called it, for the government of its use by the two bodies. By the first article of this canon, the church was to be and remain a German Reformed and Evangelical Lutheran church, under the name of "Emanuel's Church." The third and fourth articles provide for funerals and burials in the burial-ground, from which it appears a graveyard was to be used in connection with the church. The thirteenth declares, that each congregation shall have equal right to the church property, and each pastor shall so arrange his *divine service,* as not to interfere with the pastor of the other denomination. The fifteenth article provides that it shall be allowed to hold *divine service* in two languages, in English and German.

The master finds, that *divine service* only was to be held in the church, and that by common understanding of both congregations, no meetings other than those for divine service could be held in it, and that, for a period of over twenty years, no other than meetings for public worship or preaching the Gospel were held there ; that a Union Sunday school, organized and kept up by the congregations, was held for many years in a school-house close by the church. A short time ago, the Lutheran congregation withdrew from the Union Sunday school, and established one of their own in the audience-room of the church, in opposition to, and without the consent of the German Reformed congregation.

This bill is to prevent this unauthorized and continued use of the audience-room for the Sunday school. The master finds, that Sunday schools were not in existence or thought of in this neighborhood at the time of the union of these congregations, and adoption of their rules ; that both congregations understood, and rigidly adhered to the understanding, that a " preaching service " only was to be maintained in the church, and that singing schools, prayer meetings, and the like, were forbidden to be held there. He concludes by saying, he is satisfied, from the articles of association, and the testimony in the cause, the preaching of the gospel only was understood by the members of both congregations to be the " divine service " mentioned in the articles. In the court below, the controversy was not upon the facts reported, but upon the meaning of the terms " divine service ;" the defendants holding that they embraced Sabbath schools. The witnesses agree, that the German word *Gottesdienst,* used in the articles of union, means in English, *divine service ;* and the court below decided that this included Sunday-school service. That prayer and praise, and, indeed, oral as well as written instruction in religious matters, by laymen, are used in Sunday-school service, is true, and in a general sense it may be said to be divine service. Indeed, the Reverend Samuel J. Milliken did say, in his testimony, that the

more extensive use of the term divine service, includes the performance of any duty arising out of our obligations to God; but in the more restricted sense it is used to signify acts of religious worship. This would give two significations to these words. Like words of art, the sense in which they have been used by the parties must, therefore, be sought for. It is the duty of courts to interpret the language of written instruments; but in doing this they always follow the meaning attributed to the terms by those whose custom it is to use them. Therefore, when a contract is capable of two different interpretations, that which the parties themselves have always put upon it, and acted upon, especially as here for a long series of years, a court will follow, because it is the true intent and meaning of the parties which are to be sought for in the language they use. However right it may be to view, as the court did, the Sunday school as a most useful institution in instructing youth in the knowledge and worship of God, and their duties to mankind, this praiseworthy view cannot change a written contract. We cannot engraft on a contract for one thing an agreement for a different thing, though the fruit of the scion be even better than that of the natural stock.

These congregations never so understood or acted upon their agreement of union. They built their church for divine worship, by prayer, praise, and the preaching of God's word. Its use was to be *congregational worship,* not *school instruction.* Their worship was to be led by *pastors,* who should regulate their appointments in due regard to mutual harmony, and was not to be the instruction of youth, even though part of it were in divine things, led by *individual laymen.* There are reasons, also, why a chamber or audience-room, dedicated to public congregational worship, should not be thrown open to thoughtless, giddy, sometimes vicious youths, to deface and soil it. We think the court erred in deciding the case according to the general meaning of the words "divine service," as testified to by some of the witnesses, instead of confining their signification to the sense in which the congregations understood it when they entered into the agreement, and afterwards practised upon it.

A doubt has been suggested as to the jurisdiction of the court in such a case, but, we think, without a solid ground. As unincorporated associations, the parties fall directly within the fifth equity head of the Act of 16th June 1836, conferring on the Supreme and Common Pleas Courts jurisdiction in the supervision and control of unincorporated societies or associations and partnerships: Foley *v.* Tovey, 4 P. F. Smith 130, is in point, opinion by the present Chief Justice. The number and relations of these parties, and the subject and nature of the injury, also, make the case one for the peculiar jurisdiction of equity. The number of the members of each congregation, and the uncertainty in their

identity and connection with the congregation, make a remedy at law neither convenient nor certain. There would be some difficulty in moulding a common-law action to remedy the perverted use. The subject of the use is also peculiar. Such congregations are not governed by the ordinary rules of tenancy in common. It has been decided there can be no partition of a church or a graveyard held by two congregations, precisely as these two hold their property: Brown v. The Lutheran Church, 11 Harris 495. The language of Woodward, J., is forcible and just, in which he shows the sacrilegious character of a proceeding that would sell the altar and the graves; that a church cannot be divided; and that the policy of the state has always been to protect the resting-places of the dead. A sale is the only mode of partition in such a case; and what, he asks, would these graves, of inestimable value to surviving relatives, fetch in the market? This case, therefore, does not, on this ground, fall within the principle of North Pennsylvania Coal Company v. Snowden, 6 Wright 488.

The nature of the injury, too, is to be noticed. It is not an act of wrong or injury to the property itself, nor is it an ouster from possession, or wrongful withholding of the possession by one congregation from the other, but a mere perversion of its use; and here again it differs from The North Pennsylvania Coal Company v. Snowden, and from Tillmes v. Marsh, 17 P. F. Smith 507. In those cases the bills were what is termed an ejectment bill—a bill to obtain possession and enforce rights under a legal title. Here the injury consists in a perversion of the right of the congregation, a misuse of its privileges under the articles of union, and it is continuing in its nature. It involves a series of injurious acts of misuse, and therefore can have no adequate remedy at law, if an action for damages could be conveniently sustained. This brings the case directly within the letter and spirit of the fifth head of equity, in the second branch of powers contained in the Act of 1836, to wit: "The prevention or restraint of the commission or continuance of acts contrary to law, and prejudicial to the interests of the community, or the rights of individuals." The congregation defendant is not only an unincorporated association, and thus within the control of the court, but the congregation plaintiff is composed of individuals, whose rights are prejudiced by the defendants, and therefore entitled to the exercise of the restraining power of the court. In either way jurisdiction attaches. The right of the plaintiffs is not disputed, which takes the case out of the rule that the court will not enjoin upon a disputed title till it is settled at law. It is only the illegal acts of the defendants that are the subject of dispute, and they are clearly contrary to law, as we interpret the agreement of union. The disposition of this court has been not to deal with these equity

[Gass's Appeal.]

powers in a narrow spirit, but to make them serve all the purposes of justice to which they can be made applicable. In Wesley Church *v.* Moore, 10 Barr 280, Chief Justice Gibson remarked, that "the equitable jurisdiction conferred by these statutes is a valuable, indeed indispensable one, and ought to be extended by every interpretation of which the words are susceptible." The same opinion has found utterance in subsequent cases: Kirkpatrick *v.* McDonald, 1 Jones 393; Yard *v.* Patton, 1 Harris 282.

The actual exercise of this valuable power of restraint has been sustained in numerous and analogous cases, which may be briefly noticed, premising that in the same clause is found the supervision and control of partnerships following directly after the supervision and control of unincorporated societies and associations, subjects analogous in the unincorporated membership, and the close and confidential relations of the members in each class. Thus in Stockdale *v.* Ullery, 1 Wright 486, a partner was restrained from pawning or pledging the notes of the firm for his own debts. So a partner may be restrained from doing acts prejudicial to the estate of a deceased partner: Holden's Admin'r *v.* McMakin, 1 Pars. 284. And a person may be restrained from doing business contrary to a lawful agreement not to do so: Palmer *v.* Graham, 1 Pars. 476. So to restrain the use of a party-wall before payment of a moiety of the cost: Sutcliff *v.* Isaacs, 1 Pars. 494. To prevent the holder of a legal title from conveying it away contrary to equity: O'Neil *v.* Hamilton, 8 Wright 18. To restrain associates from denying the right of one chosen by a publishing company as the editor of a paper, and preventing his publication of it: Peacock *v.* Cummings, 10 Wright 434. To prevent a usurpation of power by a portion of a body which should be a unit, as the Common Council of Philadelphia: Kerr *v.* Trego, 11 Wright 292. To restrain an unlawful sale under execution of the property of the wife for the debt of the husband: Lyon's Appeal, 11 P. F. Smith 15. Without further citation, Kisor's Appeal, 12 P. F. Smith 428, may be instanced as a case in point. There a deed was made of a church property to trustees, for the use of two congregations, with a provision for division in a certain manner, if conducive to the interests of the parties. One congregation took exclusive possession. Held to be a dispute between members of an unincorporated society in relation to their rights and privileges, and not merely as tenants in common of real estate, and equity had jurisdiction to restore the excluded party to their rights. Sutter *v.* Trustees of First Reformed Dutch Church, 6 Wright 503, is also an authority on this point. The decree of the court below, dismissing the bill, is therefore reversed, and the bill restored, and report of the master confirmed, and it is hereby ordered and decreed, that the defendants named in the bill of the plaintiffs, be enjoined and restrained perpetually from using the

[Gass's Appeal.]

said church described in the bill, for the purpose of holding Sunday or Sabbath schools therein, and that the defendants pay the costs.

WILILAMS, J., dissenting.—I concur in the construction given to the articles or canons in this case, but I dissent from the decree on the ground that the evidence does not show that any such injury has arisen, or is likely to arise from the act complained of, as warrants the interposition of a court of equity to restrain it by injunction.