# Myers' Estate.

*Contracts—Interpretation—Jurisdiction O. C.*

1. Every contract should be construed so as to give effect to the intention of the parties. In ascertaining that intention, it is proper to consider all the negotiations leading to the formation of the contract, its subject matter, and the end to be accomplished.

2. When a contract is capable of two interpretations, that which the parties themselves placed upon it, and acted upon for a series of years, will as a rule be accepted by courts as the proper interpretation of the true intent and meaning of the parties.

3. Testator at the time of his death was the owner of 1,190 shares of the capital stock of a corporation which had 1,500 shares issued and outstanding. The remaining shares were owned by three children of the testator. By his will, made a year prior to his death, testator disposed of all his property including his holdings in the corporation. Under the scheme of his will, the business of the corporation was to be maintained and continued under the management of a son, one of the three children holding stock, until testator's youngest child should arrive at the age of twenty-one years, unless all the legatees by unanimous consent in writing should otherwise agree. The testator appointed his wife and the before mentioned son guardians of his minor children and executors of his will. At the time of the will, testator was indebted to a bank on notes amounting to $87,000.00 for which the 1,190 shares of stock of the corporation were pledged as collateral, and was also indebted to the same bank in the sum of $25,000.00 secured by the mortgage on his mansion house. Testator contemplated the payments of his debts out of the proceeds of his life insurance, but it was found that only $7,000.00 of the insurance was payable to the estate while $93,000.00 was payable to the widow and heirs. To protect the estate and have it administered according to the wishes of the testator, the widow, legatees, and guardians entered into an agreement to pay off the indebtedness and adjust other matters relating to the interests of the widow and legatees, and by which the widow and legatees agreed to turn over the proceeds of the insurance to the executors for the estate. Some time later, negotiations were begun for the consolidation of the corporation with other similar companies, which negotiations ripened into a contract. In order to consummate the proposed consolidation the widow, legatees, executors and guardians entered into a written agreement giving their consent to the consolidation and embody-

ing the terms and conditions upon which the consent was given and the contract agreed to. This agreement contained no language relating to the shares owned by the individual holders of the stock. Ten clauses of its recitals referred to the different provisions of the will. There was no direct suggestion in the agreement that the individual shareholders should surrender their stock to the estate. The agreement provided for a distribution of the stock of the consolidated company received in the exchange among the parties. The parties to the agreement on the day of its execution, at a meeting of the stockholders of the corporation, ratified a resolution of the board of directors authorizing the distribution of the stock of the consolidated company, to be made upon the basis that the distribution provided for in the agreement referred to such part of the stock of the consolidated company as the estate of the testator was entitled to receive in exchange for the 1,190 shares of the capital stock of the company which the decedent owned, and did not include the remaining shares owned individually by three of the children of the testator. The stock of the consolidated company received in exchange for the 1,500 shares of the corporation was distributed according to such distribution as provided for by resolution of the board of directors, certificates were issued to the parties upon this basis and dividends were paid directly to the holders of this stock for a long period of years. Upon exceptions to the account of the executors, *held,* (1) that the agreement between the widow, legatees, executors and guardians giving their consent to the consolidation included only the 1,190 shares interest of the testator in the corporation and did not affect the interests of the other individual shareholders and that the three children who were individual holders were entitled to participate in the distribution of the consolidated stock in proportion to their individual holdings in the corporation; (2) that in considering the account of the executors the Orphans' Court had no jurisdiction over the stock of the individual shareholders; and (3), that division of the consolidated stock among the persons entitled thereto was not to be made upon the basis of the appraised value of the property turned over by the corporation to the consolidated company at the time of the consolidation, but was to be made by distributing the common and preferred stock of the consolidated company to the stockholders of the corporation in proportion to their holdings.

Argued October 16, 1912. Appeal, No. 209, Oct. T., 1912, by Charles H. Myers, from decree of O. C. Beaver Co., Dec. T., 1910, No. 6, on exceptions to account in

estate of Henry M. Myers. Before BROWN, POTTER, ELKIN, STEWART and MOSCHZISKER, JJ. Reversed.

Exceptions to report of M. J. Patterson, Esq., Auditor.

Henry M. Myers died on August 30, 1898, leaving to survive him a widow, Ella D. Myers, and six children, namely, Charles H. Myers, Anna Amanda Wheaton, Caroline Myers Hamilton, Julia Lide Dewey, Frank Simpson Myers and Henrietta Myers. The last two mentioned were at the death of decedent minors, and by his will he appointed his widow, Ella D. Myers, and his son, Charles H. Myers, testamentary guardians.

The agreement of September 6, 1901, referred to in the opinion was as follows:

Whereas, Henry M. Myers, in and by his last will and testament, dated the 11th day of January, A. D. 1898, since his decease, duly probated and remaining in the Register's Office of the County of Beaver, and registered in said office in Will Book "L," page 132, etc., among other things in the second clause thereof directed that certain notes given by him and his son, Charles H. Myers, and held by the Economy Savings Institution should be paid out of the proceeds of certain policies of life insurance held by him and that the certificates of stock of the H. M. Myers Company attached to said notes and pledged as collateral security for the payment of the same, should on the payment of the notes revert to his estate and be held by his executors for the benefit of his wife and children, as provided in his said will, the same as if said certificates of stock had never been pledged as collateral security as aforesaid; and in the fourth clause thereof willed as follows: "Upon the purchase by my executors of the notes hereinbefore referred to, or any part of them out of said insurance money, I give, devise and bequeath the same to my wife, Ella D. Myers, and my children, Charles Henry Myers, Caroline Myers Hamilton, Anna Amanda Wheaton,

Julia Lide Myers, Frank Simpson Myers and Henrietta Myers, and any child or children that may be hereafter born to me, the interest of my wife and all the above children to be and to have share and share alike; the interest of my wife therein to be for and during the natural life and the interest of my children born or that may be hereafter born to share and share alike; and at the death of my wife the share or shares which I have bequeathed to her as above to her for life shall go to and vest in my children born or to be born in fee. And I further direct that my wife Ella D. Myers, and my son, Charles H. Myers, shall act as managers and trustees for the use jointly of my said wife and children as aforesaid."

And in the sixth clause thereof willed and directed as follows: "All letters patent for inventions of any kind in the manufacturing of shovels or other purposes, issued to me by the United States or other governments, any and all interests in patents of any kind owned by me at my death I give, devise and bequeath into the hands of my wife, Ella D. Myers, and my son, Charles Henry Myers, to be managed, controlled and used in the manufacturing of shovels, etc., as above stated, for the best interests of all my heirs and legatees hereinbefore mentioned as may seem in their judgment without being questioned by any one."

And in the seventh clause thereof: "Whenever my youngest living child shall attain the age of twenty-one years, division and distribution may be made of my estate to and amongst those entitled hereunder; but in no case shall division and distribution take place or be made at the age of twenty-one of my youngest living child without the written consent of all my heirs entitled thereto hereunder this my will. But if my said wife be living at the time when my youngest living child reaches the age of twenty-one years and distribution takes place by the consent of all my heirs, as above stated, no division or distribution made shall disturb or affect her in the enjoyment of her life estate in the home-

stead or mansion property given her under the first clause of my will, or in such property as may be obtained in lieu thereof for her by exchange or purchase."

And in the eighth clause: "If any of my children die, whether before or after my decease and before the time fixed and appointed for the possession and enjoyment by them of any of the parts or portions of my estate according to the terms and conditions of this my will, and leaving issue to survive them, such issue shall stand in the place of the deceased parent or parents and take and enjoy the share or portion of their respective parents, then deceased, would have taken if then living, and such share or portion should be distributed share and share alike between them in case there be more than one. But if such child or children dying without issue at the time fixed for the possession and enjoyment as aforesaid, the share of said child or children shall go to and vest in the rest of my children in equal shares or portions."

And in the tenth clause recited the fact that he had induced his son Charles Henry Myers, to purchase five thousand dollars of the capital stock of the H. M. Myers Company, and in order to do so and to secure five thousand dollars cash from the Beaver Valley Building and Loan Association, he also induced him to mortgage his homestead; and in consideration of his doing as he advised he agreed to pay said building and loan association the monthly payments on said loan until the same should be paid in full and then directed that when he ceased to pay the same his estate should be responsible for said payments until the whole amount of said loan should be fully paid; and that in consideration of his estate paying the balance due on said loan, then the five thousand dollars of said stock referred to and made in the name of my son Charles H. Myers, shall revert back to my estate, and that my son, Charles H. Myers, is hereby directed to sign back and surrender up the five thousand dollars stock above referred to, to my estate for distribution among the heirs as hereinbefore pro-

vided for in this my last will; In consideration of which my son, Charles Henry Myers, shall be released by my estate through my administrators lifting the bond and mortgage on his homestead now held by the Beaver Valley Building and Loan Association.

In the twelfth clause he directed that his son, Charles H. Myers, should be and serve as manager of the H. M. Myers Company, the large amount of the capital stock of which company he held and owned, until his youngest child should arrive at the age of twenty-one years, directed as to the compensation he should receive for his services as manager.

And in the thirteenth clause, willed and directed as follows: "Now to the end that the business of manufacturing shovels, etc., as now carried on by the H. M. Myers Company, may be maintained and continued for the support and benefit of my heirs and those who may come after under the law, I here will, require and so order it that all the stock of the H. M. Myers Company now issued, or that may be issued or increased hereafter, in addition, as may be under law, and that in consideration of all the stock that I have already given to my son, Charles Henry Myers, which has been paid out of the earnings of the company by my consent; and also all stock given to my daughter, Caroline Myers Hamilton, and my daughter, Anna Amanda Wheaton, and also all stock required by all my lawful heirs at my death, as named in clause fourth, I have given and give and devise and bequeath all aforesaid stock of the H. M. Myers Company, and that may be issued with the express understanding, proviso and condition that none of my heirs named in clause fourth shall have the right to sell or give away any of the stock of the H. M. Myers Company that they may have or hold under the provisions of this my will, except that in case any of my heirs should wish or desire to sell any or all of the stock that they may hold under the provisions of this my will, that they may sell such stock to the heirs re-

maining in the business of manufacturing shovels, etc., under the name of the H. M. Myers Company, on such terms, price and conditions as may be agreed upon between my heirs who wish to sell stock and my heirs who wish to purchase said stock; but in no case and under no circumstances shall my heirs who wish to dispose of or sell their stock to my heirs remaining in the business of manufacturing shovels, as now carried on, demand more than par value for the stock referred to. If the heirs in interest who wish to sell their stock accept the price offered by the heirs who wish to purchase the stock, as above referred to, then in such case my heirs who refuse to accept price or consideration offered by my heirs who wish to purchase said stock, they must accept the situation as a consequence of refusing to accept the price offered for such as above referred to by remaining as stockholders in the business as carried on by the H. M. Myers Company, and participate in the profits and losses as the case may be. I repeat in short, in connection with the above that in no case and under no circumstances, whatever, shall any of my heirs as named in section fourth holding stock as above sell or give away any stock of the H. M. Myers Company to any person, party or parties outside of the heirs holding said stock except as provided above. But there provide and agree that in case all my heirs named in clause fourth should desire and agree by a unanimous vote in writing that any of the heirs may sell their stock or discontinue the manufacture of shovels as now by the H. M. Myers Company, they may do so without violation of this will."

And in the fourteenth clause, appointed his wife, Ella D. Myers, and his son, Charles Henry Myers, guardians of all his minor children at the time of his death; said guardians to have the care and the management of the shares and interest of said minor children in his estate.

And in the eighteenth clause of his will, appointed his wife, Ella D. Myers, and his son, Charles Henry Myers,

executors of his said last will, without being required to give bond.

And whereas the business of manufacturing shovels, etc., has been carried on by said H. M. Myers Company since the decease of said testator, substantially in accordance with his desire as expressed in said will and the same has been successful and profitable, but a proposition has been made looking to the combination of the plant and property of the H. M. Myers Company, with the properties and plants of the St. Louis Shovel Company, the Wright Shovel Company, T. Rowland's Sons, incorporated, and Oliver Ames & Sons Corporation, all of which properties are now used and operated in the manufacture of shovels, etc., and to this end the other corporations and concerns have or are about to sell and transfer their plants and properties to the Ames Shovel and Tool Company, a corporation organized and existing under the laws of the State of New Jersey, which corporation shall own, manage and operate said plants and properties in the business of manufacturing shovels, etc., and said Ames Shovel and Tool Company have offered to purchase the plant and property of the H. M. Myers Company, paying as a consideration therefor, two hundred and sixty thousand, six hundred eight dollars, by the issue and delivery of said H. M. Myers Company, or upon its order and to the persons it may designate to that amount, the seven per cent. cumulative preferred capital stock par value, and the same amount, par value, of the common capital stock of said Ames Shovel and Tool Company; the said H. M. Myers Company also agreeing to subscribe for and take one hundred and thirty thousand and three hundred and four dollars, par value, of the additional preferred capital stock of said Ames Shovel and Tool Company, and pay therefor in cash, at par, or the equivalent of cash, in merchandise, to wit: stock of goods finished and in process and material on hand at its factory in Beaver Falls, Pennsylvania, which proposition or offer we, the

undersigned, have fully considered and believe it to be for the best interest of ourselves and all parties similarly interested as holders of shares of the capital stock of the said H. M. Myers Company, that it be accepted and the property sold and transferred to said Ames Shovel and Tool Company, accordingly; and

Whereas, the aforesaid will of Henry M. Myers, the material portions of which are largely set forth hereinabove, and through and by which will we have become largely interested in the capital stock of the said H. M. Myers Company, and in the management or disposal of the property of said company may be thought by some as placing restrictions upon and restraining the sale of the plant and property of the company aforesaid.

Now therefore be it known,

First. That we, the undersigned owners and holders of capital stock of the H. M. Myers Company, and interested in portions of said capital stock, as legatees under the last will aforesaid hereby give and declare our assent to and approval of the sale of the plant and property of said company to the Ames Shovel and Tool Company, for the consideration and on the terms hereinabove recited, and request the said company, through its proper officers, to carry said sale into effect and consummate the same.

Second. And in consideration of the premises of the benefits and advantages that will accrue to us, we do each and all hereby agree to and with each other, and each with all the others and with the aforesaid executors of the last will of Henry M. Myers, deceased, that if said sale is consummated and the capital stock of the Ames Shovel and Tool Company issued in consideration and payment of the property as above stated, a partial distribution of the same may be made presently, and without awaiting the arrival at twenty-one years of age of the youngest child of said testator, or as directed in said will, as follows:

A. One hundred thousand dollars of said capital

stock, to be issued and received as aforesaid, shall be issued to and held by the executors of the will aforesaid, for the benefit of the estate of said testator during the life time of Ella D. Myers, widow of said testator, the dividends or income thereof to be used and paid according to the discretion of said executors for the benefit of said widow, and for any benevolent and charitable purposes said executors may determine, in accordance with the spirit, custom and habit of said testator in his life time. And at the death of the said Ella D. Myers, said stock to be distributed to and amongst the legatees in the shares or proportions as directed in the fourth clause of said will as to her share of the stock of the H. M. Myers Company for her life.

B. One-seventh of the balance or remainder of said stock issued and received as aforesaid shall be issued to the executors aforesaid, who shall hold the same as assets of and for the benefit of the estate of the said testator; the dividends and income thereof to be paid to said Ella D. Myers during her natural life, and at her death, said stock to be distributed to and among the children of the testator in the shares and proportions as provided in reference to the stock of the H. M. Myers Company, distributable at her death, under the provisions of said will.

C. The residue and remainder of said stock, when issued and received as aforesaid, to be equally divided between the children of said testator, Charles H. Myers, Caroline Myers Hamilton, Anna Amanda Wheaton, Julia Lide Dewey, Frank Simpson Myers and Henrietta Myers.

Third. In the event that said sale is consummated and the stock in consideration thereof is issued and delivered and distribution made, as above agreed by us, we each hereby release and discharge the said executors of the will aforesaid, of and from any liability to us and each of us, for and on account of any act or thing done or to be done by them or either of them, in the making or con-

summating the distribution aforesaid, and herein above agreed by us to be made.

Fourth. We also hereby authorize and empower said executors to execute and deliver to said Ames Shovel and Tool Company any deed or instrument of transfer proper and necessary to vest in said company any interest said testator or his estate had or has in any patents issued by the United States for inventions and improvements in making shovels or in any way connected with or relating to the making thereof, or machines and appliances therefor, the same being embraced in the offer or purchase by said H. M. Myers Company.

In testimony whereof, we have hereunto set our hands and seals the sixth day of September, 1901.

|  |  |  |
|---|---|---|
|  | Charles H. Myers, | [Seal] |
|  | Ella D. Myers, | [Seal] |
|  | William M. Hamilton | [Seal] |
|  | Caroline M. Hamilton, | [Seal] |
|  | Julia L. Dewey, | [Seal] |
| Attest: | Anna Amanda Wheaton, | [Seal] |
| Henry Hice. | Chas. H. Myers, | [Seal] |
|  | Ella D. Myers, | [Seal] |
|  | Executors of Will of H. M. Myers. |  |
|  | Ella D. Myers, | [Seal] |
|  | Chas. H. Myers, | [Seal] |
|  | Guardians of Frank Simpson Myers and Henrietta Myers. |  |

We hereby sign our names as expressing our assent and approval of the foregoing.

Victor F. Dewey,
Frank M. Wheaton.

The other facts appear in the opinion of the Supreme Court.

The auditor sustained exceptions filed to the account.

Upon exceptions filed to the report of the auditor, the court modified the auditor's report, sustaining and overruling the exceptions to the extent of the modification and stating a schedule of distribution.

*Errors assigned* were to the decree of the court.

*J. Rankin Martin,* with him *Agnew Hice* and *J. Gilmore Fletcher,* for appellants.

*J. F. Reed,* for appellees.

OPINION BY MR. JUSTICE ELKIN, January 6, 1913:

A brief statement of material and undisputed facts is necessary to an intelligent understanding of the questions raised by this appeal. At the time of the death of Henry M. Myers, whose estate is the subject matter of this distribution, he was the owner of 1,190 shares of the capital stock of the H. M. Myers Company, a corporation with 1,500 shares issued and outstanding. The remaining shares, not belonging to the estate of the decedent, were owned as follows: Charles H. Myers, 210 shares; Anna Amanda Wheaton, 50 shares, and Caroline Myers Hamilton, 50 shares. In the year prior to his death decedent made his last will and testament disposing of all his property, including his holdings in the corporation hereinbefore mentioned. Under the scheme of his will the manufacturing business of the H. M. Myers Company was to be maintained and continued under the management of his son, Charles Henry Myers, until the youngest child should arrive at the age of twenty-one years unless all the legatees by unanimous consent in writing should otherwise agree. The testator appointed his wife, Ella D. Myers, and his son, Charles Henry Myers, guardians of his minor children and executors of his will, thus showing the confidence reposed in them. The executors proceeded with the administration of the estate in such manner as to carry out the wishes of the testator. At the time of making his will Henry M. Myers was indebted to the Economy Saving Institution on notes amounting to $87,000.00, to the payment of which the 1,190 shares of the capital stock of the H. M. Myers Company were pledged as col-

lateral. He was also indebted to the same institution in the sum of $25,000.00, secured by a mortgage on his mansion house. It was the duty of the executors to provide for the payment of these obligations and other items of indebtedness in order to relieve the estate from serious embarrassment. The testator contemplated the payment of his debts out of the proceeds of his life insurance, but it was found that only about $7,000.00 of insurance under the terms of the policies was payable to his estate, while about $93,000.00 was payable to the widow and heirs. In this situation, and in order to protect the estate, the widow, legatees and guardians entered into the agreement of October 21, 1898. This agreement undertook to and did make arrangements for the payment of the indebtedness and the adjustment of several other matters relating to the interests of the widow and legatees in the estate of the decedent. The widow and legatees agreed to turn over the proceeds of the insurance policies in which they were named as beneficiaries to the executors for the use and benefit of the estate. All this was done to the end that the estate might be protected and administered according to the wishes of the testator as expressed in his will. The most valuable asset of the testator was the stock held by him in the H. M. Myers Company, all of which was pledged as collateral on these loans. In order to redeem the collateral it was necessary to pay the loans, and this was done with the proceeds of the insurance policies turned over to the executors. With the indebtedness out of the way and the 1,190 shares of stock redeemed, the executors were in position to continue the manufacturing business of H. M. Myers Company in connection with the other shareholders, and this was done. The situation then was that the estate owned and absolutely controlled 1,190 shares of the capital stock of the manufacturing company, and the remaining 310 shares were held by the individuals above named. Charles Henry Myers, not only represented himself as a stockholder,

but by the express provisions of the will of the testator was made general manager of the business of the corporation. Under his management the business prospered, which, of course, resulted to the benefit of all the stockholders in proportion to their respective holdings in the company. The estate of the decedent was most largely benefited by the successful conduct of the business because it was the largest owner of the capital stock. This was the situation in 1901 when negotiations began for the consolidation of the H. M. Myers Company with several other companies engaged in the same kind of manufacturing business. These negotiations ripened into a contract, the terms of which are set forth in the agreement of September 6, 1901, upon the proper construction of which the solution of the questions involved in this controversy depends. In order to consummate the proposed consolidation it was necessary for the widow, legatees, executors and guardians to give their consent in writing in accordance with the provisions of the will and this was done by the agreement in question. It was an important transaction to the widow and legatees as well as to all others concerned, and hence the necessity of embodying in the contract the terms and conditions upon which the consent was given and the contract agreed to. All this was done, the sale was made, the property turned over, and the deal consummated. It is contended for appellees that the agreement of 1901 included not only the interest of the testator in the H. M. Myers Company, but also the interests of the other individual shareholders, and that the division of the entire amount of preferred and common stock of the Ames Company taken in exchange, should be made exclusively among the widow and legatees of the testator without permitting Charles Henry Myers, Anna Amanda Wheaton and Caroline Myers Hamilton to participate in the distribution in proportion to their individual holdings in the Myers Company. Appellant, on the other hand, strongly urges that such an inter-

pretation of the agreement of 1901 is not warranted by its
language and that it does violence to the rights of the
individual shareholders. The agreement of 1901 does not
contain a single phrase or sentence relating to the shares
owned by the individual holders of the stock. The spirit
and purpose of the agreement appears in the recitals,
conditions, covenants and undertakings of that instru-
ment. That it was intended, primarily, as an agreement
affecting the interest of the testator in the H. M. Myers
Company cannot be seriously questioned. It was exe-
cuted by the legatees named in the will and by the
executors of the estate and the guardians of the minor
children. Ten clauses of the recitals, covering several
pages of the paper book, refer to the different provisions
of the will, and the whole purpose of the agreement
seems to have been to provide for the disposition of the
interest held by the estate in accordance with the wish
of the testator. There is not a suggestion in the agree-
ment that the individual shareholders should surrender
their stock to the estate, nor in our opinion does such
a result follow by implication. The theory relied on
by appellees is that the distribution of the preferred
and common stock of the Ames Company taken in ex-
change for the property of the Myers Company is abso-
lutely controlled by clauses (a), (b), (c) of the second
paragraph of the agreement, and that when so under-
stood the individual shareholders are excluded. This
would be an easy solution of the vexed questions here
involved, but it would have the effect of sweeping away
valuable property rights without giving anything in
return, and this should never be done by implication
unless the facts clearly warrant such a conclusion. It
cannot be said that the agreement in question viewed in
the light of the facts and circumstances under which
it was made and the purpose of its execution clearly
warrants such an implication. The more reasonable and
rational construction of the second paragraph of the
agreement is that the distribution therein provided for

refers to such part of the stock of the Ames Company as the estate of the testator was entitled to receive in exchange for the 1,190 shares of the capital stock of the Myers Company, which the decedent owned. This construction gives force and effect to the will of the testator and the agreement of the parties without doing violence to the rights of the individual shareholders. It should not be overlooked that the testator could only dispose of his own property. It was not within his power to make disposition of the shares held by individuals in the stock of the Myers Company. It is conceded that at the time of his death the testator only owned 1,190 of these shares and his power of disposition was thus limited. It necessarily follows that the provisions of the will relate to the shares owned by the testator over which he had the power of disposition. The widow and legatees likewise could only take what the testator had to give, which as to the stock of the Myers Company was 1,190 shares. All of the subsequent agreements entered into between the widow, legatees, executors and guardians relating to the interest of the testator in the stock of the Myers Company must be understood as referring to the 1,190 shares held by him at the time of his death. It is argued on the part of appellees that the agreement of 1901 is plain and unambiguous and that its construction is for the court. That its construction is for the court may be conceded, but that it is plain and unambiguous is, to say the least, doubtful. It can scarcely be said that the meaning of an instrument is plain about which counsel, courts and interested parties disagree. The present is such a case and it is because the parties cannot agree as to the meaning of the agreement in question that we have this appeal. As we read the agreement, taking into consideration all of its provisions, considering the subject matter to which it relates and the circumstances under which it was made, the conclusion seems irresistible that the division of the stock provided therein referred to the

interest held by the estate of the testator in the H. M. Myers Company. Every contract should be construed so as to give effect to the intention of the parties. In ascertaining that intention, it is proper to consider all the negotiations leading to the formation of the contract, its subject matter, and the end to be accomplished: McMillin v. Titus, 222 Pa. 500. Every agreement should be interpreted with reference to the circumstances under which the parties contract and in the light of the objects to be accomplished: Callen v. Hilty, 14 Pa. 286; Richardson v. Clements, 89 Pa. 503; McKeesport Machine Co. v. Insurance Co., 173 Pa. 53. Applying these rules to the present case there is no escape from the conclusion that the division of the stock mentioned in the agreement of 1901 was only intended to affect those interested as legatees under the will of the testator and that the subject matter of the division was the interest of the testator in the Myers Company, or its equivalent in the shares of stock in the Ames Company taken in exchange therefor. When a contract is capable of two interpretations, that which the parties themselves placed upon it, and acted upon for a series of years, will, as a rule, be accepted by courts as the proper interpretation of the true intent and meaning of the parties: Gass's App., 73 Pa. 39; People's Nat. Gas Co. v. Braddock Wire Co., 155 Pa. 22; Gillespie v. Iseman, 210 Pa. 1. In the case at bar the parties to the agreement on the very day of its execution at a meeting of the stockholders of the Myers Company ratified a resolution of the board of directors of said company authorizing a distribution of the stock of the Ames Company to be made upon the basis for which appellant contends. The stock was in fact so distributed, certificates were issued to each of the parties upon this basis, and dividends have been paid directly to the holders of this stock for a long period of years. Certainly, this is a case of the parties themselves placing a construction upon their own contract and it is not for the courts

to say that it means something else.   In addition, it
might be added that the only jurisdiction which the
Orphans' Court had was over the estate of the testator,
and since that estate only owned 1,190 shares of stock
in the Myers Company, its jurisdiction was limited to
the inquiry whether there had been an accounting by
the executors for this amount of stock.   The Orphans'
Court has no jurisdiction in auditing the account of the
executors of a shareholder, to ascertain and distribute
the profits, or property, or stock of the corporation
in which decedent was a shareholder: Goetz's Estate,
236 Pa. 630.   The Orphans' Court had no jurisdiction
over the stock of the individual shareholders which did
not belong to the estate of the testator.   These indi-
vidual shareholders had the right to make their own
contracts and to demand in their own right such a share
of the stock of the Ames Company as they were entitled
to receive.   The executors were only required to ac-
count for the 1,190 shares belonging to the estate of the
testator, and the jurisdiction of the Orphans' Court was
limited to the inquiry whether they had properly ac-
counted for these shares.   These were the only shares
included in the inventory, and so far as is disclosed by
this record, the only shares which belonged to the tes-
tator at the time of his death.   On the question of the
jurisdiction of the Orphans' Court in such matters, see:
Cutler's Estate, 225 Pa. 167; Williams' Estate, 236 Pa.
259.

We cannot agree with the learned court below as to
the basis adopted for making a division of the stock
among the persons entitled thereto.   The division was
made upon the basis of the appraised value of the prop-
erty, real and personal, which the Myers Company
turned over to the Ames Company at the time of the
consolidation.   This appraisement, made by an expert
representing the parties to the consolidation, was only
intended as a basis for fixing the relative portions of the
preferred and common stock the merged companies

were entitled to receive out of the total issue of the consolidated company. It had no controlling effect as to the amount of stock each individual shareholder of the Myers Company was entitled to receive. The property and assets of a corporation represent the value of its capital stock and when property is sold, the proceeds go to the treasurer for the benefit of the stockholders. When dividends are paid in cash, or otherwise, each stockholder is entitled to his pro rata share according to his stock holdings. In the present case, if the property and assets of the Myers Company had been sold for $600,000.00 in cash, no one would question the right of each shareholder to participate in the distribution in proportion to the number of shares held by him. This principle is not affected by the mere fact that the consideration paid for the transfer of the property was the preferred and common stock of the Ames Company and not cash. Each stockholder was entitled to his proportionate share of the consideration either in dividends declared or in the division of the preferred and common stock if this method was adopted. This principle was entirely ignored in the distribution directed to be made by the learned court below. This was error.

The only doubt we have about any of the matters brought to our attention is as to how the contribution by the widow of the proceeds of the insurance policies made payable to her should be treated. The evidence leaves this question in doubt as to whether it was intended as a voluntary gift, or as a loan to the estate. There does not seem to be any reason why the widow should have contributed twice as much as the other legatees when her ultimate interest in the estate was not so great as theirs. It, however, is difficult for courts to determine what the parties meant when they have failed or neglected to say what was intended. In the light of the division of the Ames stock by the parties themselves immediately following the consolidation, it is apparent that the widow did not assert any right as an individual

to participate in that distribution.  On the other hand, she acquiesced in it for a long period of years, and even in the present proceeding has not on her own account asserted any claim to a share of the stock which was divided many years ago, nor has she made any claim to be reimbursed out of the estate of the testator.  In this situation we are not in position to finally determine what rights, if any, she may have, and this is, therefore, left as an open question.  The adjudication before us only relates to a partial account so that this question may be considered at a future accounting.  That the widow is entitled to equitable consideration at least to the amount she contributed in excess of the other legatees is very apparent, but this is a matter calling for amicable adjustment by the interested parties themselves before the final settlement of the estate.

Decree reversed, exceptions filed to the account dismissed and account confirmed.  Costs to be paid out of the estate.