## Trexler's Estate

*Reuben J. Butz*, for accountants.
*Fred B. Gernerd*, for claimants.

GEARHART, P. J., May 12, 1936.—We are called upon to decide in this case whether the promise of the late Harry Clay Trexler to eight superannuated employes, which promise was scrupulously kept during his life, is an enforceable contract against his estate. The eight claims are very similar in their nature, and will be treated as a group. Their points of difference will be discussed. The testimony reveals the following facts:

For years General Harry Clay Trexler was engaged in the lumber and planing business, known as the "Trexler Lumber Business," and latterly as "The Trexler Lumber Company." Six of the claimants were in the employ of the

lumber company for many years. William J. Levan was employed for 33 years; Henry A. Zinszer 33 years; Harvey M. Erney 31 years; Alfred D. Ludwig 31 years; Forrest F. Ritter 27 years, and Harvey E. Albitz 25 years. Another claimant, Robert A. W. Sterner, was employed by the decedent as a farm hand for a period of 27 years. Due to an injury to his hand incurred in line of duty, which was followed by blood poison resulting in the loss of his arm, Mr. Sterner was retired and promised a pension of $50 a month as long as he lived. The eighth claimant is Ida C. Diefenderfer, widow of Edwin B. Diefenderfer, who was in the employ of General Trexler for more than 40 years. At the time of his death Edwin B. Diefenderfer was receiving a pension of $50 per month, the pension having started on July 31, 1930. Mr. Diefenderfer died on November 17, 1930. On the very date of Mr. Diefenderfer's death General Trexler, in company with his wife, called at the Diefenderfer residence and informed the widow that from thence forward she was to receive the $50 pension formerly allotted to her husband. This promise, like all the others, General Trexler executed during his life without flinching. Mrs. Diefenderfer is only claiming $50 per month from the death of General Trexler to the date of Mrs. Trexler's death, because on that date a bequest contained in the will of Harry Clay Trexler in her favor became operative.

With the exception of the Sterner claim, all of the pensions were granted under the following circumstances: Sometime after the economic depression of 1929 set in, it was brought to the attention of General Trexler by those whom he had placed in executive positions that the volume of business did not justify the employment of all the men then on the payroll, and since there was not enough work for all, there was the alternative of retaining the older men who had faithfully served the company for many years and discharging the younger men, or retaining the younger men and discontinuing the services of the older employes who by reason of age were not as efficient as

they once were. General Trexler was loath to discharge these old employes who had rendered loyal service over a long period of years. Thereupon several conferences ensued between General Trexler and his executives, at which time all of the facts relative to the status of the men were considered by the general. It was then decided by General Trexler that the situation could be relieved by pensioning the old.men, the claimants, and retaining the young men. Accordingly, the executives were authorized by the general to tell the aged employes that henceforth they would be retired on a pension of $50 per month, with the exception of Mr. Levan, who was to receive $60 per month, and Mr. Ritter, who would receive $20 per month. The pension was to continue during the life of the recipient.

## Discussion

The above facts are not in dispute, with the exception of the cases of Harvey M. Erney, Henry A. Zinszer, Harvey E. Albitz and Forrest F. Ritter, where it is intimated, if not disputed by the executors, that General Trexler did not state the duration of the pensions. While it is true that none of the witnesses in the excepted cases testified that General Trexler promised a pension for life, neither did they testify to any definite period of time that the pensions were to continue. The fact is that General Trexler continued payments up to the moment of his death, and there is not the slightest evidence in the case that he used the word "pension" in the limited sense of a duration for less than life.

Nolan P. Benner, private secretary to General Trexler, testified that the so-called "pensions" were paid out of a special account which the general replenished with his individual funds; that from time to time the general would direct him to place the name of a given employe on the pension list by saying, "Put this man on the pension list"; "That man is to get so much pension"; "See that they get their checks monthly." Mr. Benner used a card system to keep account of the pension list. In addition to

the claimants, the names of two other people appear. These received their pensions to the date of their death. General Trexler never removed any name placed on the pension list, but continued to pay the monthly stipend during the lifetime of the named individuals. Mr. Benner's record was as follows:

Monthly                          Pensions
                 Now Ida
$50.00   Diefenderfer, Edwin B.  Begin 7-31-30
         Died 11-17-30      1137½ Liberty St.
$50.00   Marsteller, Eugene         Begin 8-31-30
         Last check              1223 Chew St.
$50.00   Neff, Oscar A., Slatington, Pa.
$50.00   Zinszer, Henry A., Allentown, Pa.
                 541 Cleveland St.
$60.00   Levan, Wm. J., 1442 Turner St., City.

We have found as a fact that General Trexler intended that all of the claimants should receive the stipend for life. His purpose in granting the payments is not seriously disputed. He was taking care of faithful employes who had given of their best over a long period of years.

The evidence and all the circumstances indicate quite clearly, it seems to us, that General Trexler used the word "pension" in its ordinary sense, i. e., that it was a continuing pension during the life of the recipient. It was a reward to old men for their years of faithful service. The word "pension" is defined in Webster's New International Dictionary as:

"A stated allowance or stipend made . . . , in consideration of past services or of the surrender of rights or emoluments, to one retired from service . . . a regular stipend paid by a government to retired public officers, disabled soldiers, the families of soldiers killed in service".

The word "pension" conveys the thought to the average person not only of a periodic payment, but also of duration, and that embraces the thought that it extends for life. Soldiers' pensions, except when allowed for physical disability incurred in military service, when granted to

old veterans, are for life. By whatever technical name payments are made by governments or corporations to individuals for past services, they are associated in the public mind and speech as "pensions," and the word carries with it the implication that the grant is for life. It is simply a case of hairsplitting to argue that, because it does not definitely appear by direct testimony that General Trexler stated it should be for life, he intended a lesser duration. Especially is this so when all the surrounding facts are considered. It does not appear that General Trexler intended certain employes to receive a pension for life whilst others whose age and years of service approximate the former should receive it for a lesser duration. So far as has been disclosed by the testimony he thought of it as a system, and when he directed that a name be placed on the pension list it was there with the others, in all respects alike, except as to the amount payable. That he thought of it as a system is gleaned from the testimony of Mr. Hagenbach, one of General Trexler's executives, who testified, in part:

"A. I approached General Trexler on a party not interested in this litigation about putting him on this pension list and he told me at that time he would put him on the list, but this would be the last one. We would break him if we kept up this way. I asked him a personal question and I said, 'How about me', and he said, 'You need not worry, you, Mr. Fritz and Mr. Adams will be taken care of but you will not get what you are getting now'; and he granted the pension to that particular party that I spoke about.

"Q. Did he tell you for what length of time?

"A. He would pay $50 a month as long as he lived, but he would have to work whenever we had work for him and deduct the amount that he would earn regularly from the amount of pension that he would receive.

"Q. You had known of these different persons on the pension list?

"A. Had heard about it but not from General Trexler.

"Q. You knew about them?

"A. Yes.

"Q. You had spoken to the General about putting these other gentlemen on the same list as those that were getting it?

"A. Yes, sir.

"Q. He then agreed to put him on the list the same as the others in this conversation?

"A. Yes sir."

Nolan P. Benner testified, in part:

"Q. And General Trexler ordered his name to be put on this list?

"A. He told me to add him to the list and send him a check monthly."

Robert J. Wheeler testified to a conversation had with General Trexler in the summer of 1931, at which time the general acknowledged that he had pensioned some of his old employes.

From all of these circumstances we conclude that the word "pension" was used and understood by both the general and the retired employes to be a stipend for the rest of their lives. Said Mr. Justice Simpson in Huffman v. Huffman, 311 Pa. 123, 127:

"As we said in Foundation & Construction Co. v. Franklin Trust Co. et al., 307 Pa. 10, 15: 'The standard for the interpretation of words is their natural meaning to the parties who have contracted at the time and place where the contract is made, considering all the circumstances surrounding it: McMillin v. Titus, 222 Pa. 500 . . . Words are to be construed according to their primary acceptation' ".

Under this state of facts the question boils down to the proposition stated at the beginning of the opinion. The executors, while not directly opposing the claims made by these superannuated employes, opine that there is no legal basis for supporting the claims; that the promises made by General Trexler were gratuitous and not based on a consideration; therefore not binding on the estate. It is

conceded that, if the transaction between General Trexler and the claimants rises to the dignity of a contract, the death of General Trexler did not terminate it, but that the performance of General Trexler's undertaking is enforceable against his executors: Young, Admx., v. Gongaware, 275 Pa. 285; Commonwealth of Pa., for use, v. Long et al., 110 Pa. Superior Ct. 7; American Surety Co. of New York v. Kunkle, Admr., 117 Pa. Superior Ct. 525; Huffman v. Huffman, supra.

No case has been cited which is on all fours with the one before us, and our own research has failed to reveal any. Generally speaking, to make a contract requires legally sufficient consideration in return for a promise. Consideration has been defined, in substance as "a detriment incurred by the promisee or a benefit received by the promisor at the request of the promisor": 1 Williston on Contracts (revised ed.), sec. 102; Presbyterian Board of Foreign Missions v. Smith, 209 Pa. 361; Mikos v. Kida et al., 314 Pa. 561; York Metal & Alloys Co. v. Cyclops Steel Co., 280 Pa. 585. But there are cases in which neither assent nor consideration is a necessary requisite in the enforcement of a promise. This group of cases is referred to in sections 86 to 90 of the A. L. I. Restatement of the Law of Contracts. Section 90 provides:

"A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

On page 111 this principle is illustrated thus:

"A promises B to pay him an annuity during B's life. B thereupon resigns a profitable employment, as A expected that he might. B receives the annuity for some years, in the meantime becoming disqualified from again obtaining good employment. A's promise is binding."

Section 90 of the A. L. I. Restatement of the Law of Contracts has been referred to by our Supreme Court in

Union Trust Co. v. Long, 309 Pa. 470, 475, and the principle applied in Langer v. Superior Steel Corp., 105 Pa. Superior Ct. 579, 584. While the facts in the latter case bear some resemblance to the one before us, the case was there decided on the basis of good and sufficient consideration to support the contract. Judge Baldrige, writing the opinion of the court, did, however, state:

". . . this contract is enforceable also on the theory of promissory estoppel. (Referring to section 90 of the Restatement of the Law of Contracts) . . . As we have already observed, the plaintiff was induced by the promises made to refrain from seeking other employment. A promissory estoppel differs from the equitable estoppel, as it rests upon a promise to do something in the future, while the latter rests upon a statement of a present fact. We have an example of the former in Ricketts v. Scothorn, 57 Neb. 51, 77 N. W. 365, where a grandfather handed his granddaughter a note for $2,000 saying, 'I have fixed out something that you have not got to work any more. None of my grandchildren work and you don't have to.' The grandfather did not ask his granddaughter to give up her employment, but merely promised that she would not have to work unless she wanted to. She stopped working, relying upon getting $2,000. The court admitted that there was no consideration, but enforced the promise because it had misled the promisee in such a way that it would be unfair to her to do otherwise; thereby invoking the principle of promissory estoppel. We do not mean to state that in all cases where a gratuitous promise is made, and one relies upon it, the promisee can recover, but, if a detriment of a definite and substantial character has been incurred by the promisee, then the court may enforce the promise."

What led to the adoption of section 90, and its purpose, are best shown by the record of the proceeding of the American Law Institute when section 90 was before that body for consideration.

Inter alia, Professor Williston remarked: Proceeding IV, Appendix, Am. L. Inst. 4-29-26, page 85:

"I suppose the fair inference is that it [injustice] does mean injustice to the promisee; but whether it means pecuniary loss or loss of some other kind is not defined . . . Unquestionably, the word 'injustice' . . . leaves a certain leeway one way or the other to the judge. As someone expressed it . . . if you bind up too closely, with definite mathematical rules the law of consideration, the boiler will burst. You have got to leave the court a certain leeway outside of those mathematical and exact rules. This section is, so to speak, the safety valve for the subject of consideration . . . As to . . . what injustice means, it means something indefinite and the meaning is purposely left somewhat indefinite."

(Page 92:)

"Injustice is a word that is more or less indefinite anyway, and I wished as far as possible to characterize it. Certainly, I should dislike very much to leave out the word 'substantial,' and I think the word, 'definite' ought to be left in. Those words narrow the Section undoubtedly. If you leave them out, you make the Section broader and I think add to its vagueness. Perhaps, I may illustrate. The uncle says to Johnny, simply out of a clear sky, 'I am going to give you $1,000.' The money is to be a present, and perhaps Johnny is expected to invest it—there is no telling. Then Johnny launches forth into high life. Under the Section as it stands, there could be no recovery on the promise even though it might be somewhat hard on the boy that he had so ventured forth and then found he could not get the money to support his venture. We have not gone so far as to say that any reliance on a gratuitous promise will render the promise enforceable provided injustice cannot be otherwise avoided. We have confined the Section to the case where a reasonable person would say that the promisor expected the man to do just what he did or that he ought to have expected it."

It would seem from the above that the framers of section 90 recognized the fact that there is a class of cases where gratuitous promises should be enforced for compelling reasons of justice, where the promisee incurs a substantial detriment on the faith of such promises, and this, whether the promisor intended the detriment or not. The test seems to be whether the promisor could reasonably have expected the detriment to be incurred on the strength of the promise. If the detriment is incurred, and there is no other way of avoiding injustice, the promise is enforceable. Of course, as pointed out by Judge Baldrige, in Langer v. Superior Steel Corp., supra, and also by Professor Williston in his work on "Contracts", [vol. 1, revised ed. 502]; not every gratuitous promise and reliance thereon is enforceable. The doctrine must be limited in its application to that group of cases where the reliance on the promise brought about such a substantial, changed condition on the part of the promisee that enforcement of the promise is the only way to avoid injustice. What constitutes injustice has not been defined; that, it would seem, must be determined from all the surrounding circumstances of each case. Professor Williston hints that injustice does not necessarily mean pecuniary loss. As he points out, the meaning is "purposely left somewhat indefinite", which means that the equities of each case must point the way to its solution under this doctrine of promissory estoppel.

The doctrine of promissory estoppel has been adopted as the law in many States: 1 Williston on Contracts (revised ed.) sec. 139, and cases there cited. For an interesting discussion on the subject see the opinion written by Cardozo, C. J., in Allegheny College v. National Chautauqua County Bank of Jamestown, 246 N. Y. 369, 159 N. E. 173; Siegel v. Spear & Co., 234 N. Y. 479, 138 N. E. 414; also the case of W. B. Saunders Co. v. Galbraith et al., 40 Ohio App. 155, 178 N. E. 34, wherein the Court of Appeals of Ohio squarely approved section 90 of the A. L. I. Restatement of the Law of Contracts, adopting it as the law of Ohio, holding:

"We are content, however, to take the restatement as the law of this state without exploring its soundness, and hold that of its own vigor it is adequate authority. This is not to say that the restatement is of necessity perfect, and that in it is to be found the law's last word. We only hold that he who would not have it followed has the burden of demonstrating its unsoundness."

The question then remains, is the doctrine of promissory estoppel applicable to the facts in this case? There is here present an unqualified promise to pay these claimants a pension for life. In return they were to relinquish their positions of employment, which they held for many years. They complied with this arrangement, relying on the promise of General Trexler.

It is quite true that General Trexler could have summarily discharged the men. He was under no legal obligation to keep them in employment, but the fact remains that he was loath to dispense with their services without making some provision for their bleak old age. This is shown by the numerous conferences he had with his executives, and the consideration of each man's financial situation, his age, and general status. These men had served him faithfully over a long period of years, and, as stated by counsel for the accountants at the argument, "some of them were very near and dear to him." It is clear that two things moved him to pension the men: On the one hand he wanted to reduce overhead, and at the same time he wanted to give these few old faithful employes some protection. If the men had not accepted the proposed offer of pension, it is an open question what General Trexler would have done. Unquestionably he had the upper hand and could have discharged the men, but under the surrounding facts developed in this case, and considering the affectionate relationship between employer and employe, the years of service rendered and the age of the men, we hesitate to believe that these men would have been summarily discharged against their wishes. However, it is not necessary to speculate on this point; suffice it to say

the men accepted the offer and received the pension. What effect then could General Trexler reasonably expect his promise to have on the men? Just what he intended: a belief that their economic welfare was provided for in their declining years; that is, to the extent of the pension.

What other effect could the promise have upon men aged 70 years and upwards? Certainly the most natural thing to expect of these men was cessation in whole or in part from their labors. They had been accustomed to manual labor all their lives. It is neither reasonable nor probable to suppose that the average man of 70 and upwards will continue to work at manual labor when his future economic security is assured, as it was in this case. Thus, the result of the promise was to raise in the minds of the claimants a sense of security, which continued for several years, during General Trexler's lifetime. Suddenly to stop payment of the pensions under these circumstances was about as cruel mental torture as we can conjure up. That, to our way of thinking, is sufficient substantial and definite change of position to warrant the enforcement of this promise.

But if it be thought the mental torture is not enough, then it is demonstrable that these men will suffer in a pecuniary sense if the promise is not enforced. Relying on the promise, these men did not seek employment with the same degree of assiduity as they would have if no promise had been made. It is no answer to say that General Trexler did not condition his promise upon the claimants giving up all other employment, or that the men in all probability could not have secured employment during these depression years, or that they were not employed at any rate from the time the promise was made. The point is that in relying on the promise they did not feel that a job was a matter of life or death. As a consequence they did not have the same urge to find employment. That General Trexler knew this when he made the promise is obvious, as it must be to all of us. For the claimants, considering their age, these years were vital. In the

nature of things their years of gainful employment were numbered when General Trexler pensioned them. That was one of the reasons for retiring them, and for the pension. The opportunity for wages that might have been earned by these men during the years in which they relied on the promise is gone. In all probability the years of absence from their manual labor has unfitted them for any work in the future. That constitutes a pecuniary loss.

For us as a court of first instance, an appellate decision would be a most welcome signpost. Having none, we rely on the doctrine of law as enunciated in section 90 of the A. L. I. Restatement of the Law of Contracts. The instant case calls for the application of the principle of law there stated. Only in the enforcement of the promise can injustice be avoided. This doctrine of promissory estoppel has for its object the doing of justice, which we recognize is a nebulous term, but nonetheless real. The circumstances of this case call for the application of the doctrine on the grounds of fair play and decency. Section 90 had its genesis in the best spirit of the law, i. e., to do justice between man and man.

In the case of The Perkiomen Brick Co. v. Dyer, 187 Pa. 470, our Supreme Court brushed aside all technical caviling as to whether a man should be held to his promise. Chief Justice Sterrett there said:

"It is unnecessary in this case to say whether, under the uncontradicted evidence to which brief reference has been made, the alleged subscription is strictly legal and binding on the defendant. But, in view of the facts and circumstances connected with his undertaking to accept and pay for the stock in question, and his subsequent acts, etc., we are clearly of opinion that the defendant is estopped from questioning the validity of his contract, even if it were only in parol. To permit him to repudiate it would, in the circumstances, be unjust and inequitable."

There is still another reason why the promise should be enforced. All the circumstances show that when General Trexler made the promise, he intended to be bound. Not

once during his lifetime did he attempt to recall it; every man whose name was placed on the pension list was paid regularly during his lifetime. Death alone stopped further payment. The promise became a solemn covenant between himself and the claimants. It was not based on the historical and traditional term of consideration. The parties did not contemplate that any consideration should move from the promisee to the promisor. It seems that the motive which caused the promise, so far as General Trexler was concerned, furnished sufficient reason to make the bargain. To him, the satisfaction he derived from doing what he considered the decent thing was sufficient. That is indicated by every act performed by the general after making the promise, his conversation with the executives, and his conversation with Mr. Wheeler, telling the latter what he had done for some of his aged employes. To all intents it would appear that he regarded the matter settled, that he considered his promise a binding obligation. The men looked at it in the same light. Under such circumstances why should the law be astute and bring into the case highly strained technical principles of law requiring consideration, to invalidate a contract which the parties themselves understood to be complete and valid? General Trexler in his lifetime never welshed on his promise; why should his estate. To assign to General Trexler even the thought of repudiating his solemn promise, made and fulfilled, so far as he was able, by him, is to debase the memory of a great philanthropist who left an estate in excess of $10,000,000 for the welfare and good of his community. Such a man would hardly retract a solemn promise to his aged friends who served him faithfully during their best days. This factor, added to what had already been said, is sufficient reason for enforcing the promise.

Now, May 12, 1936, the executors are ordered and directed to pay the claimants as follows: Robert A. W. Sterner, $50 per month, Henry A. Zinszer, $50 per month, Harvey E. Albitz, $50 per month, William J. Levan, $60

per month, Alfred D. Ludwig, $50 per month, Harvey M. Erney, $50 per month, and Forrest F. Ritter, $20 per month, from November 17, 1933, to the date of this order, and thereafter at the same rate per month until a trust fund is erected in the hands of the trustees, who will thereafter continue the payments. Interest will be calculated on these claims from November 1, 1935.

In the case of William J. Levan the bequest contained in the will of the testator is included in the $60 per month payment.

The executors will pay to Ida C. Diefenderfer the sum of $50 per month from November 17, 1933, to December 20, 1934, and interest from December 1, 1935, to this date.

This decree is to become final unless exceptions are filed within 10 days herefrom.