# McMillin *v.* Titus, Appellant.

*Contract—Construction of contract—Subject-matter—Repugnant clauses —Prior negotiations—Circumstances surrounding parties—Interpretation by parties—Oil lease—Coal—Mines and mining.*

In construing a contract the language should be interpreted so that the agreement as a whole may be carried into effect. If possible, no part of the contract is to be disregarded or treated as redundant. Repugnant clauses must be reconciled if it can be done.

In ascertaining the intention of the parties to a contract where the writing is ambiguous, or where there are apparently repugnant clauses, it is proper to take into consideration all the negotiations leading to the formation of the contract, its subject-matter, the purpose to be effected, the consideration passing between the parties, and also all the circumstances surrounding the parties when they entered into the agreement.

Where the parties have interpreted the contract themselves and acted upon such interpretation, the court will regard it as the proper one, and enforce it accordingly.

Facts of public notoriety relating to the subject of a contract must be presumed to have been known to the parties at the time of making the contract and the language used must be construed in reference to such facts.

On an issue framed under the Act of June 10, 1893, P. L. 415, to·determine title to coal and other minerals underlying land of the defend-

ant, it appeared that thirty-eight years prior to the framing of the issue defendant's predecessor in title executed a paper granting and leasing to the plaintiffs' predecessors in title the right and privilege of prospecting for coal, oil or other minerals, and for salt, oil or other substances in and upon the land in question, and the right and privilege to dig, excavate and bore and sink pits and wells for any or all of the said coal, ore, salt, oil or other minerals, and to remove and take the same out of the earth. All interest of the grantor to the coal, oil, ore or other minerals was released. The grantees were given certain surface privileges "and the free use of as much wood and coal as may be required to operate the machinery in sinking or pumping any or all wells that may be sunk by the said parties." A money consideration was mentioned in the deed, and it was also provided that if oil should be found in paying quantities a further sum stated should be paid. At the time this paper was executed an oil excitement prevailed in the neighborhood, and prior to the execution of the paper two wells had been put down on the property. Coal existed on the land, and was mined for domestic purposes, but not commercially. The grantees under the paper operated the land for oil, found it in paying quantities and paid the additional compensation. Fifteen years afterwards the lessees and those holding under them abandoned the oil wells. They never opened any mines for coal. The coal, however, was continually mined for domestic purposes by the defendant and his predecessors in title. Defendant's immediate predecessor in title conveyed the land to him, "subject to such restrictions and leases as are now held upon said premises." Taxes on the whole property were continually paid by defendant and his predecessors. During the fifteen years prior to the framing of the issue, plaintiffs had made no claim whatever to the coal, oil or other minerals in the land. *Held* (1), that the paper in question was a lease of the oil, gas and salt; (2) that the lease had been abandoned; and (3) that the defendant on the uncontradicted evidence was entitled to a verdict and judgment in his favor in the issue framed.

*Landlord and tenant—Abandonment—Court and jury.*

Abandonment ordinarily is a question of fact to be determined by a jury under all the circumstances of the case. There must be an intention to abandon as well as an actual abandonment of the property and usually it is necessary for the jury to determine these facts, but where there is no dispute as to the facts, and no testimony offered in contradiction of the evidence to establish the abandonment, and the credibility of the witnesses on the part of the lessor is not attacked or in any way impugned, and the evidence is clear and explicit and the inferences to be drawn from it certain and not open to doubt, and the case is such that if it was before a court and jury, the court would not sustain a verdict which did not find that the lessee had abandoned the

premises, it is the duty of the court to determine the law from the admitted facts and to direct a verdict accordingly.

Argued Oct. 12, 1908. Appeal, No. 103, Oct. T., 1908, by defendant, from judgment of C. P. Greene Co., May T., 1905, No. 86, on verdict for plaintiffs in case of Mary B. McMillin et al. v. L. C. Titus. Before Mitchell, C. J., Fell, Brown, Mestrezat, Potter, Elkin and Stewart, JJ. Reversed.

Issue to determine title to minerals. Before Holt, P. J., specially presiding.

The facts are stated in the opinion of the Supreme Court.

Verdict and judgment for plaintiffs. Defendant appealed.

*Error assigned* among others was in refusing binding instructions for plaintiffs.

*J. W. Ray,* with him *H. C. Staggers,* for appellant.

*A. F. Silveus,* with him *James J. Purman* and *Willis F. Mc-Cook,* for appellees.

Opinion by Mr. Justice Mestrezat, January 4, 1909:

In construing a contract, the language should be interpreted so that the agreement as a whole may be carried into effect. If possible, no part of the contract is to be disregarded or treated as redundant. Repugnant clauses must be reconciled if it can be done. It cannot be assumed that the parties inserted repugnant or contradictory clauses or sentences in their contract, and, therefore, when there is an apparent contradiction in different parts of the instrument, it must be reconciled if possible so that the whole agreement will be given effect as expressing the intention of the parties. In ascertaining their intention, it is proper to take into consideration all the negotiations leading to the formation of the contract, its subject-matter, the purpose to be effected, the consideration passing between the parties, and also all the circumstances surrounding the parties when they entered into the agreement. Where the terms of the promise admit of .more senses than one, the

promise is to be performed in that sense in which the promissor apprehended at the time the promisee received it: Williamson v. McClure, 37 Pa. 402, 408. Every agreement is to be interpreted and construed with reference to the circumstances under which the parties contract: COULTER, J., in Callen v. Kilty, 14 Pa. 286, 288. The words of a grant are to receive a reasonable construction, and one that will accord with the intention of the parties; and, in order to ascertain their intention, the court must look at the circumstances under which the grant was made: Connery v. Brooke, 73 Pa. 80, 83. A contract should be construed in the light of the surrounding circumstances and the objects manifestly to be accomplished: Richardson v. Clements, 89 Pa. 503, 505; McKeesport Machine Co. v. Insurance Co., 173 Pa. 53, 57.

Where the parties have interpreted the contract themselves and acted upon such interpretation, the court will regard it as the proper one and enforce it accordingly. "When a contract is capable of two different interpretations," says AGNEW, J., in Gass's Appeal, 73 Pa. 39, 48, "that which the parties themselves have always put upon it, and acted upon, especially as here for a long series of years, a court will follow, because it is the true intent and meaning of the parties which are to be sought for in the language they use." Courts will, if they can, give to the contracts of parties the exact effect which the parties themselves gave to them, and interpret them just as they interpreted them: Gillespie v. Iseman, 210 Pa. 1. When the court is asked to say what the parties meant or intended by their contract, it is entirely safe to point to their own construction of it, as evidenced by their course of dealing under it: People's Natural Gas Co. v. Braddock Wire Co., 155 Pa. 22, 25. Facts of public notoriety relating to the subject of a contract must be presumed to have been known to the parties at the time of making the contract, and the language used must be construed in reference to such facts: 9 Cyclopedia of Law & Procedure, 588.

An important and controlling question involved in this case requires the interpretation of a written contract. In the early part of 1864, Solomon Elliott, of Wharton township, Fayette

county, procured a patent for a tract of land, containing about 108 acres, lying on both sides of Dunkard creek, and about one mile from the mouth of the creek, in Greene county. Within a year or two after he had obtained the patent, Elliott removed to the premises where he continued to reside until 1870. In that year he sold and conveyed the land to Levi Titus, "subject to such restrictions and leases as are now held upon said premises by the Seaton and Pioneer Oil and Mineral Company," and Titus at once entered into possession of it. For seven or eight yours Benjamin Titus, the son of the owner, resided on the land. L. C. Titus, another son of the owner, and the defendant in this action, then removed to the land and has since occupied it. Levi Titus died in 1886 and shortly thereafter about seventy-seven acres of the farm were awarded to L. C. Titus in partition.

Of these seventy-seven acres of land, about thirty-three acres are underlaid with the Pittsburg or River vein of coal. Titus sold this coal in 1902, and went to Waynesburg, the county seat of Greene county, to procure an abstract of title. Then he learned for the first time that there was on record an instrument in writing purporting to place the title to the coal in other parties. Upon examination, there was found the record of a paper, dated June 4, 1864, between Solomon Elliott of Wharton township of the first part and Charles S. Seaton and George W. K. Minor of the second part, all of Fayette county. The paper was signed by both parties. By this paper, Elliott for the consideration of $300, paid him in hand, and a further consideration of $500 to be paid him out of the oil obtained on the premises "granted, bargained, demised and leased . . . . to Seaton and Minor, their heirs and assigns, the sole and separate and exclusive right and privilege of prospecting, examining and searching for coal, ore, or other minerals and for salt, oil, carbon oil, or other substances in and upon" his tract of land in Dunkard township; "and the right and privilege to dig, excavate, bore and sink pits and wells for any or all of the said coal, ore, salt, oil, carbon oil or other minerals and substances and to remove and take the same out of the earth on the premises aforesaid, hereby granting and releasing to the

said party of the second part . . . . all interest of the said party of the first part to the coal, ore, oil, carbon oil or other minerals and substances in or upon and under the same." The second parties were to have "the free use of erecting all necessary machinery and frames and vats to bore, dig and sink pits or wells and the free use of one acre of land at or immediately around each pit or well which said parties of the second part . . . . may sink or dig upon said land and for erecting the buildings necessary to operate in digging and sinking said wells or pits and in working them after being sunk, in taking therefrom salt, oil, carbon oil, coal, ore or any other minerals or substances, and the free use of as much wood and coal as may be required to operate the machinery in sinking or pumping any or all wells that may be sunk by the said parties." It is further provided that "in case the said parties of the second part succeed in finding oil in sufficient quantities to justify operating any well sunk upon said land say ten barrels per day then the said parties of the second part agree to pay the said Solomon Elliott the additional sum of $500.00 as soon as enough oil is realized to amount in value to that sum and the same been put into market." An habendum and tenendum clause follows this stipulation.

In August, 1902, Titus presented his petition to the common pleas of Greene county averring, inter alia, the existence of the Elliott paper and asked that the court frame an issue under the Act of June 10, 1893, P. L. 415, between him and the plaintiffs in this action "to settle and determine their respective rights and title in and to" the coal and other minerals in and underlying the tract of land of which he claimed to be the owner. An issue was framed in which the successors in title to Seaton and Minor, claiming the two-thirds of the coal and other minerals, were made plaintiffs and Titus was made defendant. On the trial of the cause in the common pleas, the plaintiffs relied upon the paper of June 4, 1864, to establish their title. It was contended by the plaintiffs, and so held by the court, that the paper vested in Seaton and Minor the coal, oil and other minerals in fee, and therefore the plaintiffs, their grantees or assignees, took a fee simple title to all the minerals, in-

cluding the coal in and under the defendant's tract of land. The court submitted to the jury to find whether the defendant had established a title to the minerals by adverse possession. A verdict was rendered for the plaintiff, and from the judgment entered thereon this appeal has been taken.

We are all of opinion that the learned court below was in error in construing the paper in question, to be a deed conveying in fee simple the minerals under the Titus land. The instrument must be interpreted in the light of the then existing conditions, of the acts of the parties, and the manifest purpose the parties had in view in executing it. It appears from the evidence that in the early sixties oil was discovered on Dunkard creek in Greene county, and that there followed in that territory the usual excitement accompanying such discoveries. Drilling operations began at several points on the creek. Prior to the execution of this paper, there had been at least two wells put down on the Elliott property. Seaton and his associates were also operating wells on the Mapel farm at Bobtown, within a short distance of the Elliott farm. There were also operations for oil and gas on the Six farm adjoining, or in the immediate vicinity of, the Elliott farm. The existence of the Pittsburg or River vein of coal under the land was well known at that time. In fact, this vein of coal had been opened at a point on the farm where it outcropped on the south side of, and about thirty or forty feet above, the creek, and where it could be seen by all persons passing along the public road. The coal mined was utilized simply for domestic purposes, and beyond that there was no market for it. As the testimony shows the only implements used in mining were a pick, a shovel and a wheelbarrow. These conditions existed at the time Seaton and Minor obtained from Solomon Elliott the paper of June 4, 1864.

In the light of the undisputed facts and the acts and declarations of the parties, it is apparent that the instrument under consideration was not intended by the parties to be a deed conveying in fee simple the coal under the Elliott farm. What Seaton and Minor wanted and what Elliott granted, by the paper executed by them, was a lease of the oil, gas and salt on

the demised premises. As we have seen, at the time this paper was signed, there were several parties operating for oil in that territory. Seaton and Minor themselves were drilling and operating wells on the Mapel farm near the Elliott land when they procured this paper and they began at once drilling for oil on the Elliott farm. Several wells were put down by them on the farm. Some of the wells at least produced oil in paying quantities, and they paid the additional consideration provided in the contract. For several years the operations for oil were continued by these parties, and finally they disposed of their interests to others. But Seaton and Minor never exercised any acts of ownership over the Elliott farm save for the purpose of "prospecting, examining and searching," and drilling for and pumping oil. Nor did the successors to Seaton and Minor make any other use of the leased premises. They simply operated the oil wells which had been drilled, and drilled other wells for the purpose of obtaining oil. From the day the lease was signed in 1864 until the premises were vacated and abandoned in 1879, fifteen years thereafter, the lessees and those holding under them did not "prospect, examine or search" for coal or "dig, excavate, bore or sink pits and wells" for it. The lessees opened no mines for operating the coal on the premises nor did their successors in title ever attempt to exercise any ownership over the coal or any other mineral except the oil. On the other hand, Elliott and his successors in title mined and used the coal as fee simple owners.

Now looking at the terms of the instrument itself, we see that it does not grant, bargain and sell the coal, or the right to mine, extract or remove it. On the contrary, the language used is that ordinarily employed, although not exactly in the same form, in leasing lands for oil purposes. Elliott granted and leased the "right and privilege of prospecting, examining and searching" for the minerals. If they were found, the lessee was to have "the right and privilege to dig, excavate and bore" for them. The other language of the instrument is also strongly suggestive of a lease for oil and gas purposes. As in ordinary oil leases, reservations were made of a certain part of the farm on which the buildings were erected, of the use

of ground around the well, and of ground for erecting machinery, frames and vats. The lease also provides for an additional consideration if oil in paying quantities is found. The original consideration, $300, was manifestly for the right to occupy the premises and explore for oil, being the usual bonus given for oil leases.

In addition to these considerations, impelling the inevitable conclusion that the Elliott paper was a lease of the land for oil, gas and salt purposes, a further provision of the instrument, in the light of all the facts, conclusively shows that Elliott did not intend to convey the coal under his premises. After granting the privilege to explore, dig and excavate the minerals, the lease provides that the lessees shall have "the free use of as much wood and coal as may be required to operate the machinery in sinking or pumping any and all wells that may be sunk by the said parties, their heirs &c." If, as contended by the plaintiffs, the paper is a grant in fee of the coal, what was the necessity for this clause of the agreement? It was entirely superfluous. If the instrument conveyed the coal to Seaton and Minor, they had the right to dispose of it as they saw proper. They could sell it, or they could use it for fuel in operating the machinery at their oil wells. No such additional provision as the one just quoted was necessary to authorize the lessees to make use of the coal for any purpose. The coal referred to in this stipulation of the agreement was manifestly the Pittsburg or River seam of coal which outcropped on the premises, and which at that time was being mined to supply the country market. This clause of the agreement contradicts the theory of the plaintiffs that Seaton and Minor acquired title to the coal, and the clause shows that it was not the intention of the parties to grant or convey the coal. As all the authorities show, we cannot treat this stipulation of the agreement as surplusage, but it must be considered and enforced if a reasonable construction of the whole agreement will permit. Both parties signed the agreement, and this is a covenant on the part of Elliott which can be enforced against him. The lessees asserted their rights under this stipulation of the contract, and used coal from the open mine on the premises

for operating their machinery at the oil wells, and for no other purpose.

As a further aid in the interpretation of the agreement, we have the construction placed upon it by the parties themselves. The acts of the parties are consistent only with the view that the instrument was a lease for oil, gas and salt purposes, and the lessees and their successors in title, as appears by the evidence, recognized the instrument simply as an oil lease. They never claimed or asserted any other rights under it. Elliott put the same interpretation on the instrument. In conveying the land in 1870 to Titus, he did not reserve the coal or the right to mine and remove it, but conveyed the land "subject to such restrictions and leases as are now held upon said premises." The interpretation of the parties should have due weight, if not a controlling influence, with the court in construing the paper.

We need not discuss the authorities referred to by the plaintiffs to sustain the proposition that a conveyance in any of the several forms set forth in the cases cited vests in the grantee a fee in the coal. Those decisions are the law of this state, and we certainly have no intention in this case of overruling them or criticising the principles they establish. In those authorities, there was nothing in the contract then under consideration which made the language ambiguous or the meaning of the parties uncertain. It was just such language as we have time and again declared would pass a title in fee to coal property. The difficulty here, however, is that the contract is ambiguous, and we must look dehors the instrument for light to enable us to determine what purpose the parties had in mind in executing it. If the agreement had simply granted the privilege of digging the coal, or of digging and taking it away, or had expressed in any proper language an unqualified right to mine and remove all the coal, or had leased it for years with the right to mine it, without any qualifying or modifying phrases in the contract, we would have a different question before us. The language of the instrument itself would have spoken clearly the intention of the parties.

Regarding the instrument in question as a lease of the oil,

gas and salt in the Elliott farm, the next and only other question for consideration is, did the lessees or their successors in title abandon the lease? The facts bearing upon this question are not in dispute. The lessees themselves entered at once into the possession of the leasehold and operated the premises for oil for several years. The title passed from them to others, who also continued the operations until 1878 or 1879. If the uncontradicted evidence in the case be believed, the premises were vacated and the lease was abandoned not later than 1879. This is clearly established by the acts and declarations of the parties themselves. In 1879, and possibly prior thereto, the parties had ceased to obtain oil in paying quantities. The boilers, the machinery, and other personal property belonging to the lessees were removed from the premises; and the assignees of the lease, now represented by the plaintiffs, declared that "there was nothing more there for them and that they would not put any more money in it." During the continuance of the lease and until his death in 1890, Abraham Sterling, one of the owners of the lease, resided within a mile of the Elliott farm. McMillin and Bindley, whose interests are represented by the plaintiffs in this action, did not live in that community. They left the premises in 1879 and never returned, and thereafter never exercised any acts of ownership over the property in any way. The fee in the property was taxed to Elliott until he sold to Levi Titus in 1870. The property was then conveyed to Levi Titus, who paid the taxes until his death in 1886. Thereafter, the part of the premises owned by the defendant has been assessed to him and he has paid the taxes. He also leased the land for oil and gas purposes twice, and, to use his own language, "I have used it (the coal) in every way a man could that owned it." As shown by the undisputed evidence, since 1879 the plaintiffs and those through whom they claim have not occupied the premises for any purpose, nor did they assert any right or interest in the property until the proceedings were instituted in 1902 by the defendant for the purpose of having the title quieted. During those twenty-three years, none of the plaintiffs or their pred-· ecessors in title ever claimed any interest or right in, or at-

tempted to exercise any authority over, the defendant's farm. In fact the plaintiffs declined to assert at law any right or claim under the lease of June 4, 1864, until they were compelled to do so by the mandate of this court: Titus *v.* Bindley, 210 Pa. 121. It is apparent, therefore, that under the uncontradicted evidence in the case, there was an abandonment of the lease in 1879 by the plaintiffs under which they operated the Elliott premises for oil.

Abandonment ordinarily is a question of fact to be determined by the jury under all the circumstances of the case. There must be an intention to abandon as well as an actual abandonment of the property, and usually it is necessary for the jury to determine those facts. But here there is no dispute as to the facts. There was no testimony offered on the part of the plaintiffs in contradiction of the testimony offered by the defendant to establish the abandonment. The credibility of the witnesses on the part of the defendant was not attacked or in any way impugned. The evidence was clear and explicit, and the inferences to be drawn from it were certain and not open to doubt. If the case was before a court and jury in the common pleas, the court would not sustain a verdict which did not find that the lessees had abandoned the premises. Hence it would be the duty of the court to determine the law from the admitted facts and to direct a verdict accordingly. The learned court below should therefore have affirmed the defendant's eleventh point and directed a verdict for the defendant. We may do in this instance what the court below should have done. For more than six years, the plaintiffs have, by this litigation, prevented the defendant from selling his coal, and it would be manifestly unjust to send the case back and delay the final disposition of it by directing another trial. The facts not being in dispute, it is our duty to declare the law. This requires us to reverse the judgment of the common pleas and to enter judgment in favor of the defendant.

The judgment of the court below is reversed, and judgment is now entered for the defendant.