## Foulke v. Miller, Appellant.

588

Argued January 4, 1955.　　Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*Wm. Chas. Hogg, Jr.,* for appellants.

*Paul C. VanDyke,* with him *James A. Cochrane* and *Cochrane & VanDyke,* for appellees.

OPINION BY MR. JUSTICE BELL, March 14, 1955.

This case arose by a bill in equity for an injunction. The basic issue is: Did the agreements which prohibited defendants from dealing in cinders and cinder aggregates include slag?

The defendant, H. Hessey Miller, and his wife formerly owned a cinder business in the City of Chester, Pa., and traded under the name of "H. Hessey Miller". On or about January 1, 1943 Miller and his wife sold to plaintiffs a one-half interest in their business, which was described as that of "buying, selling and dealing in cinders and cinder products." The purchase price was $20,000. Pursuant to this written agreement plaintiffs and Miller and his wife entered into a written partnership agreement dated April 1, 1943, in which Miller agreed not to engage in a similar business within 300 miles of the City of Chester for a period of ten years.

On or about January 1, 1944 the defendants by written agreement sold to plaintiffs their remaining one-half interest in the business for the sum of $20,000. and their partnership was dissolved. Defendants in and by this 1944 agreement sold to plaintiffs "all of our interest of every kind and nature whatsoever of, in and to the above-mentioned business, and all assets of every kind and nature whatsoever in connection therewith."

Defendants also covenanted that neither of them would directly or indirectly, as an individual or as an officer or employee of a corporation, engage in the business of buying, selling or dealing in cinders or

cinder aggregates, or use the name of "H. Hessey Miller" in the business of buying, selling or dealing in cinders or cinder aggregates.

The Chancellors found that a substantial part of the purchase price was paid for the good will, the right to the exclusive use of the name "H. Hessey Miller", and complete freedom from interference or competition by Miller in any phase of the business for a period of fifteen years within a radius of 400 miles of the City of Chester.

At the time of the written agreements above mentioned, the principal uses of the cinders in the business conducted (originally by defendants and later) by plaintiffs and defendants as partners were for the construction of cinder or cinder concrete building blocks, and as fill-in for the construction of drive-ways and public roads. Cinder products or cinder aggregates were apparently used synonymously. Aggregates are any designated inert material which put together into a conglomerated mass forms concrete, mortar and plaster.

Due to strikes in the coal regions and increases in the price of coal, and the development of slag (cinder), plaintiffs in 1949 turned most of their business into *slag cinder* as distinguished from coal cinder.* Plaintiffs' business now is fundamentally the same as it was in 1943 and 1944 and they now serve the same trade they served then.

The Chancellors found from the testimony of an experienced and impressive expert, Allen J. Johnson (who testified on behalf of plaintiffs) that cinders are the solid products of combustion and are found in

---

* While cinder slag had been used in the manufacture of building blocks as early as 1930, it was not as popular nor as widely used for that purpose as coal cinder because of the cheapness and availability of coal cinder.

three forms or conglomerates of three forms, namely, ash (formed at low temperatures), clinker (formed at medium temperatures) and slag (formed at high temperatures) ; and, accordingly, the term "cinder" is a generic term used to describe these three forms. Any one of the three forms of cinder can be formed in a boiler furnace or a blast furnace and any form of cinder can be changed into any other form. Coal cinder and slag cinder differ only quantitatively and not qualitatively in their chemical constituents because the percentage of elements in coal and in iron vary in nature and, further, because there is a larger percentage of combustible matter in the coal cinders, since it is not subjected to as high temperature as iron ore in the blast furnace, and finally, the iron oxide is higher in the cinder taken from a fuel furnace than from a blast furnace because in the blast furnace operation, greater care is taken to extract the iron. Mr. Johnson further testified that the terms "cinder" and "slag" are used interchangeably and are virtually synonymous.

Plaintiffs' expert was corroborated, as the Chancellors further found, by the definition in Webster's International Dictionary of the terms "cinders" and "slag". While Webster gives six definitions of the word "cinder" the first definition is, "1. The slag from a metal furnace; dross; scoria." The third definition is, ". . . the residue of anything burnt, esp. the small particles of clinker left by burning soft coal."

Slag is thus defined by Webster's Dictionary as "1. The dross, scoria, or recrement, of a metal . . . called also esp. in iron smelting, cinder."

Defendant Miller apparently regretted the sale of his business because he attempted to persuade plaintiff, Kirk Foulke, to sell the business in 1945; and in 1948 attempted to persuade Foulke to hire him as a

consultant. Later on in that year Miller asked Foulkes' permission to go into the slag business. Foulke replied, "Hessey, that is still the cinder business. . . . you sold out fair and square and this is part of the cinder business." Miller replied, ". . . there is no law can stop me from making a living . . ." Miller thereupon went into the slag business and held himself out as "The Original H. Hessey Miller" within eight blocks of plaintiffs' property.

The Chester Blast Furnace, which supplied plaintiffs with slag, was plaintiffs' sole available source of slag. In September, 1952 defendant, H. Hessey Miller, obtained the exclusive right to purchase slag from the Chester Blast Furnace. The loss of this source of supply will, unless restrained, force plaintiffs into bankruptcy.

The Chancellors found all the important facts in favor of the plaintiffs and issued an injunction against H. Hessey Miller.

"Findings of fact made by a Chancellor who saw and heard the witnesses, when confirmed by the Court en banc, will not be reversed on appeal if they are supported by adequate evidence: Pregrad v. Pregrad, 367 Pa. 177, 80 A. 2d 58; Barrett v. Heiner, 367 Pa. 510, 80 A. 2d 729. However, that well-settled principle is confined to findings which are true and genuine findings of fact. 'With respect to [a] inferences and deductions from facts and [b] conclusions of law, both the Court en banc and the appellate Courts have the power to draw their own inferences and make their own deductions and conclusions: Barrett v. Heiner, 367 Pa. 510, 80 A. 2d 729; Noonan Estate, 361 Pa. 26, 63 A. 2d 80; Payne v. Winters, 366 Pa. 299, 77 A. 2d 407; Smith v. Smith, 364 Pa. 1, 70 A. 2d 630.': Kalyvas v. Kalyvas, 371 Pa. 371, 375-376, 89 A. 2d 819": *Peters v. Machikas*, 378 Pa. 52, 56, 105 A. 2d 708.

Defendant's principal contention is that the words "cinders" and "cinder products" and "cinder aggregates" did not include slag in 1943 or 1944; and that since slag was not used by plaintiffs at the time of the agreements the parties could not have intended the agreements to include "slag" and defendant can now engage in the slag business.

The issue boils down to what was the intention of the parties when they used the terms "cinders", "cinder products" and "cinder aggregates".

In *Betterman v. American Stores Company*, 367 Pa. 193, 80 A. 2d 66, the Court said (pages 203-204): " ' "The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles." ' " [citing cases] . . .

" ' ". . . in order to ascertain that intention, the court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement" '. . ."

In construing a contract the intention of the parties must be ascertained from the entire instrument, and each and every part of it must be taken into consideration and given effect if reasonably possible: *Neal D. Ivey Company v. Franklin Associates, Inc.*, 370 Pa. 225, 87 A. 2d 236; *Mowry, Exr., v. McWherter*, 365 Pa. 232, 74 A. 2d 154.

Where a written contract is ambiguous or conflicting, or its meaning is doubtful or obscure, parol evidence is admissible to clarify the ambiguity and to resolve the doubts, in order to ascertain and determine the intention of the parties: *Barium Steel Corporation v. Wiley*, 379 Pa. 38, 44, 108 A. 2d 336; *Albert v. Schenley Auto Sales, Inc.*, 375 Pa. 512, 100 A. 2d 605; *Waldman v. Shoemaker*, 367 Pa. 587, 80 A. 2d 776.

In the light of these principles the Chancellors properly took into consideration the evidence offered by appellant and by appellees.

One other contention of the defendant remains, but it likewise must be rejected. If the words "cinders" and "cinder products" and "cinder aggregates" were intended by the parties, as both the Chancellors and the lower Court found, to include all forms of cinders and cinder products and aggregates, and "slag" is a form of cinders, the fact (if as defendant contends, it was a fact) that plaintiffs at the time of the contracts had not bought, sold or dealt in any slag cinders would not prevent plaintiffs from dealing in slag cinders if and when they became profitable or otherwise desirable. Neither the present contracts nor the law limits plaintiffs to the form of cinders used by them at the time of the agreement. Cf. *Dowgiel v. Reid,* 359 Pa. 448, 59 A. 2d 115.

In *Dowgiel v. Reid,* 359 Pa., supra, plaintiff, the owner of the land brought a bill in equity to restrain defendants from entering on plaintiff's premises for the purpose of digging holes to erect poles thereon and to hang wires thereover. Defendants were the owners of an easement, viz., "the right and privilege of a private road or cartway of twenty feet in width" over plaintiff's land. This Court dismissed the bill and held that the owner of the easement was entitled to a use of the property *for all services reasonably necessary for the enjoyment of the easement* and was not limited to the uses in existence at the time of the creation of the easement. The Court said (pages 452, 453) : "Obviously the end to be accomplished by the awards in 1835 was that the owner of the lot or lots to which the right of the public road was appurtenant should not live in isolation but should have such access to the outside world as was necessary to his reasonable and

natural enjoyment of the ownership of the premises and of any building erected thereon. In 1835 when the easement was created the only access the owner of the lots needed was a road over which pedestrians, horses, and vehicles could travel. At that time telephones, electric lights and electric washing machines and electric cooking stoves, electric heaters, electric radios and electric vacuum cleaners were totally unknown. Today in almost every American home in localities such as the one in which this litigation has its situs electricity is almost as much of a necessity as is water. . . .

"19 Corpus Juris, pages 975, 976, sec. 219, makes this statement: 'Where a way is granted or reserved without any limitation as to its use, it will not necessarily be confined to the purposes for which the land was used at the time the way was created, but may be used for any purpose to which the land accommodated by the way may naturally and reasonably be devoted. It may be used for all the ordinary purposes of a way, subject to the general rule that the use must be reasonable; for it is well settled that where a right of way is granted in general terms no right in, or power over, the land but what is necessary to its reasonable enjoyment is conferred. The grantee is entitled to vary his mode of enjoying the same, and from time to time to avail himself of modern inventions if by so doing he can more fully exercise and enjoy or carry out the object for which the way was granted.' "

Where a contract is reasonably capable of two different interpretations, Courts will interpret the agreements just as the parties themselves did: *Alpha Claude Neon Corporation v. Pennsylvania Distilling Company, Inc.*, 325 Pa. 140, 188 A. 825; *McMillin v. Titus*, 222 Pa. 500, 72 A. 240; *Gass Appeal*, 73 Pa. 39, 41; *Gillespie v. Iseman*, 210 Pa. 1, 59 A. 266; *Peoples Natural Gas Co. v. Braddock Wire Co.*, 155 Pa. 22, 25

A. 749; *Disston Estate,* 349 Pa. 129, 134, 36 A. 2d 457. As the Court below aptly said: ". . . In the present case the Chancellors have found as a fact:

'30. Again in the year 1948, defendant, H. Hessey Miller, attempted to gain permission from the plaintiff, Kirk Foulke, to deal in slag, and when plaintiff informed him that that was part of the cinder business, the defendant, H. Hessey Miller, said that there was no law to stop him from making a living.'

and there was competent credible evidence to support such finding. This shows that the defendant did not interpret the contract to give him the right to deal in slag; otherwise he would not need to ask the plaintiff for permission to do so. It was only after this request was refused that he asserted his right to deal in slag."

There was competent and adequate evidence if believed to support all of the Chancellors' findings of fact and we agree with its interpretation of the contracts and with its conclusions of law.

Decree affirmed. The costs shall be paid by appellant, H. Hessey Miller.