BBCI, INC., Successor in Interest to
Booth Bottling Co., Inc.

v.

CANADA DRY DELAWARE VALLEY
BOTTLING CO., and Pepsi Cola Bottling Company of Pennsauken.

Civ. A. No. 70–1510.

United States District Court,
E. D. Pennsylvania.

April 28, 1975.

Theodore W. Flowers, White & Williams, Philadelphia, Pa., for plaintiff.

**300**

Theodore R. Mann, Mann & Ungar, P. C., David Berger, David Berger, P. A., Philadelphia, Pa., for defendant.

## OPINION AND ORDER

JOHN MORGAN DAVIS, Senior District Judge.

Defendant Pepsi Cola Bottling Company of Pennsauken ("Pepsi") seeks post-trial relief from a jury verdict against it based on both a contract claim and an antitrust claim. Canada Dry Delaware Valley Bottling Co. ("Canada Dry") was absolved of all liability by the jury, and is not involved in these post trial motions. Both claims against Pepsi relate to a sub-franchise agreement between Pepsi and Booth Bottling Co., Inc. ("Booth"). The breach of contract claim is based on the allegedly premature termination of this sub-franchise agreement. The antitrust claim is that the attempted repurchase and ultimate termination of the sub-franchise were among the "unfair means of competition" alleged by plaintiff, and that these were acts of unfair competition, and evidenced an anticompetitive intent. More specifically, it is the attempted repurchase from which plaintiff claims a jury may infer that defendant, at the time it granted Booth the sub-franchise, harbored a secret intent to repurchase shortly thereafter, in order to destroy Booth's employee morale, its financial stability and its root beer as a competitive product.

In November, 1968, Pepsi was offered the Hires Root Beer franchise for Southern New Jersey, Southeastern Pennsylvania and Northern Delaware, provided it could find a means of distributing the product in Southeastern Pennsylvania and Northern Delaware, where it did not operate. Pepsi therefore offered a sub-franchise to Booth, to cover the Southeastern Pennsylvania and Northern Delaware territory.

Pepsi had previously made unsuccessful attempts to acquire the Metropolitan Philadelphia Pepsi-Cola bottling plant and franchise. Booth knew this; and in its negotiations with Pepsi over the terms of the sub-franchise, the question of what would happen if Pepsi *did* acquire such a Philadelphia facility of its own, was the subject of intense discussion both between the parties and internally at Booth. The end result was that the parties entered into a sub-franchise agreement which included not only the usual termination provisions, but also a contractual provision whereby Pepsi could repurchase the sub-franchise if it paid a stipulated price, even if none of the termination provisions applied. That provision stated the following:

5.

\* \* \* \* \* \*

(d) If circumstances shall be such that at a particular time PENNSAUKEN is not entitled to terminate under subsections (b) and (c) of this section, PENNSAUKEN shall nevertheless have the right to repurchase (terminate) this subfranchise agreement by paying to BOOTH for BOOTH'S good will and for the sub-franchise a price computed by multiplying the number of standard cases of HIRES sold by BOOTH at its usual and regularly established prices during the twelve (12) month period immediately preceding the date of purchase by twenty-five cents ($.25) per case. \* \* \*

The present point of contention is that Pepsi claimed that this allowed it to repurchase the sub-franchise at will, and Booth claimed that its permission was necessary.

The sub-franchise was entered into as of February 17, 1969. Booth began bottling and distributing Hires in March, 1969. In May or June of 1969 Canada Dry Corporation decided to sell its company owned Philadelphia plant to a franchisee and began negotiations with Harold Honickman, President of Pepsi. On September 30, 1969 that transaction was finalized and Canada Dry Delaware Valley was created by Harold Honickman. On November 17, 1969, Honickman of-

fered to repurchase the Hires sub-franchise from Booth for the contractually stipulated sum. Booth refused, was terminated and this litigation followed.

### I. *Breach of Contract Claim.*

██ Under the breach of contract claim, the question we must decide is whether or not the Court was correct in submitting the interpretation of this subfranchise to the jury, and admitting parole evidence in this regard. If its provisions are ambiguous or obscure, then its interpretation becomes a question of fact for the jury, and parole evidence is admissible to aid in this interpretation. If its provisions are unambiguous and clear, then its interpretation becomes a question of law for the Judge, and parole evidence is not admissible. The question of whether its provisions are ambiguous or obscure on the one hand, or unambiguous and clear on the other hand, is a question of law for the Judge. Haskins v. Point Towing Co., 421 F.2d 532, 536 (3rd Cir. 1970); Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123 (3rd Cir. 1969); Jamison v. A. M. Byers Co., 330 F.2d 657, 660 (3d Cir. 1964); Globe Motors, Inc. v. Studebaker-Packard Corp., 328 F.2d 645, 649 (3d Cir. 1964); Magill v. Westinghouse Electric Corp., 327 F.Supp. 1097, 1107 (E.D.Pa.1971), aff'd in part, rev'd in part (on other grounds), 464 F.2d 294 (3d Cir. 1972); A. L. K. Corp. v. Columbia Picture Industries, Inc., 320 F.Supp. 816, 818 (E.D.Pa.1970), rev'd on other grounds, 440 F.2d 761 (3rd Cir. 1971); Sirianni v. General Motors Corp., 313 F.Supp. 1176, 1178 (W.D.Pa.1970); Hall Motor Sales, Inc. v. Studebaker-Packard Corp., 145 F.Supp. 430 (W.D.Pa.1956); Shipley v. Pittsburgh & L. E. R. Co., 83 F.Supp. 722, 741 (W.D.Pa.1949); Consolidated Title & Slate Co. v. Fox, 410 Pa. 336, 189 A.2d 228 (1963); Easton v. Washington County Ins. Co., 391 Pa. 28, 137 A.2d 332 (1957); Foulke v. Miller, 381 Pa. 587, 112 A.2d 124 (1955); Waldman v. Shoemaker, 367 Pa. 587, 80 A.2d 776 (1951); 12A. P.S. § 2–202 (U.C.C. § 2–202); Corbin on Contracts § 535; Notes of Testimony 3/59–60.

At trial, this Court decided that the terms of the subfranchise were ambiguous or unclear, and submitted the contract to the jury, and admitted parole evidence to aid in its interpretation. Now that the heat of trial has subsided, we must re-examine the terms of the subfranchise in the more dispassionate, reflective circumstances afforded us by defendant's post trial motions.

The contract between Pepsi and Booth contains the following provisions:

3. *Master Franchise Provisions Applicable.*

(a) * * * this subfranchise agreement is subject to the terms and conditions provided for by the printed provisions of each of the MASTER FRANCHISE AGREEMENTS attached hereto as Exhibits "C" and "D" in like manner as if such provisions were an integral part hereof and the names of the parties hereto were substituted for those of the parties to said MASTER FRANCHISE AGREEMENTS. Under no circumstances shall BOOTH'S rights hereunder within its subterritories exceed those of PENNSAUKEN under each of the MASTER FRANCHISE AGREEMENTS as they now exist or from time to time may hereafter be amended.

5. *Sales Quota.*

* * * * * *

(d) If circumstances shall be such that at a particular time PENNSAUKEN is not entitled to terminate under subsections (b) and (c) of this section, PENNSAUKEN shall nevertheless have the right to repurchase (terminate) this subfranchise agreement by paying to BOOTH for BOOTH'S good will and for the subfranchise a price computed by multiplying the number of standard cases of HIRES sold by BOOTH at its usual and regularly established prices during the twelve (12) month period immediately preceding the date of purchase by twenty-five cents ($.25) per case.
* * *

The relevant section of the Crush master franchise is:

## ARTICLE VI

## TERMINATION OF FRANCHISE

\* \* \* \* \* \*

2. Termination With Notice. In the event of any of the following:

a. The failure of BOTTLER to manufacture, bottle and sell CRUSH for any reason whatsoever for a period of 15 consecutive days except as provided in Paragraph 1 of Article IV hereof;

b. The failure of BOTTLER to manufacture, bottle and sell CRUSH within 30 days after the date hereof; then in either such event COMPANY may terminate FRANCHISE by giving written notice to BOTTLER that FRANCHISE is terminated upon date of such notice.

Pepsi argues that it had two independent justifications for terminating the contract with Booth (1) failure of Booth to sell Orange Crush, and (2) the repurchase provision in paragraph 5(d).

The Pepsi-Booth contract was dated February 17, 1969. From the date of the contract through the date of termination—a period of more than 300 days —Booth had never sold Crush. Defendant argues that this would be grounds for termination under paragraph 2 above of the master franchise agreement, which was incorporated by reference into the subfranchise agreement · by paragraph 3(a) above. The plaintiff counters this argument with three contentions of his own: (a) this argument was specifically repudiated by defense counsel himself, in his closing argument (N.T. 19/107–108); (b) Pepsi itself was not distributing Crush either, and Booth was not expected to begin distribution until *after* Pepsi had done so; and (c) no damages were awarded for the termination of the Orange Crush franchise, only the *Hires* franchise, which defendant admitted was terminated despite Booth's satisfactory performance.

However, we need not decide whether or not Pepsi was justified in terminating the contract for failure to sell Crush, since we find that Pepsi was justified in terminating the contract under paragraph 5(d).

During the ten month period of its bottling, Booth had sold 216,000 cases of Hires. At the rate of 25 cents per case, Pepsi would have owed Booth $54,000 under this contract provision. When Honickman offered to terminate Booth, he did so on the basis that he would pay $75,000, which was 25 cents times the 300,000 cases contemplated in other sections of the agreement. Booth refused the offer. Pepsi then sent termination notice to Booth.

Plaintiff first argues that the repurchase provision did not allow this purchase, or at least was ambiguous on the point, because the phrase therein—"during the twelve month period immediately preceding the date of purchase"—itself provided a one year minimum term, and only ten months had expired. However, it is clear from the entire provision that this part of the provision refers to the number of standard cases sold during the preceding twelve months, whether or not the contract was in force, and not to the term of the contract as being at least twelve months.

Plaintiff's second argument is that the repurchase provision, as all other provisions in the subfranchise, was specifically made subject to the terms of the master franchise by paragraph 3(a) above, which incorporated them by reference. Thus the subfranchise incorporated the provisions of the master franchise regarding termination. These provisions are found in Article VI, of which paragraph 2 was already reproduced above. In summary, Article VI provided for termination:

1. Without notice—in the event of the bottler's death, insanity, insolvency, cessation of business, or attempt to transfer the franchise without the national company's consent.

2. With notice—if the bottler failed to manufacture, bottle, and sell the product for any reason.

3. Within two years, with notice—by either party, if the other failed to perform and did not act to correct such failure within seven days of receiving notice thereof.

4. After two years—by either party, with 30 days notice.

Originally, this paragraph 4 of Article VI provided for termination without cause, but the words "without cause" were specifically eliminated at Pepsi's request before the master franchise was signed.

From these provisions, plaintiff somehow reads into paragraph 5(d) a requirement that Booth's permission was necessary in order to have a repurchase. The defendant relies on the explicit language of paragraph 5(d) which gives Pepsi a "right to repurchase", and makes no mention of Booth's consent or permission.

■ To understand how plaintiff reads into paragraph 5(d) a requirement of permission, we must examine its argument step by step. The first step is that because the terms of the subfranchise are "subject to" the terms of the master franchise, then the terms of the subfranchise are "controlled by" the terms of the master franchise. However, it is clear that being "subject to" the master franchise means nothing more than being incorporated by reference. All the terms stand on an equal footing, and neither set of terms supersedes the other.

The second step in the argument is that the terms of the master franchise are inconsistent with the terms of the subfranchise, and hence the terms of the master franchise "control" the terms of the subfranchise, as above, or at the least the inconsistency creates an ambiguity for a jury to resolve. But in fact there is no inconsistency between the master franchise and the subfranchise. The fact that these termination provisions are different does not make them inconsistent, only alternative. In other words, they are not to be read as being conjunctive (connected by "and"), but as disjunctive (connected by an "or"). In short, paragraph 5(d) provides a fifth mode of termination in addition to the other four enunciated in Article VI. It is an addition, not an alteration or contradiction, and as such is perfectly consistent.

■ There are four important reasons why the contract must be read in this way. Firstly, it is the reading which gives full meaning to all the provisions, and contracts *should* be read to eliminate ambiguity and inconsistency. Secondly, by giving a "right to repurchase", paragraph 5(d) necessarily implied that no permission was needed. Black's Law Dictionary defines a "right" as a "power, privilege, faculty, or demand", and further as "a capacity residing in one man of controlling, with the assent and assistance of the state, the actions of others." Thirdly, there is no term specified for the contract,* and it could happen that none of the termination provisions of Article VI would apply (note that the words "without cause" were specifically eliminated from paragraph 4 of Article VI). Thus, if paragraph 5(d) required Booth's permission to repurchase the subfranchise, Pepsi might never be able to get out of the contract. It is not reasonable that Pepsi would have bound itself with such a provision. Rather, it would have taken precautions to insure that if its relationship with Booth didn't work out, it could buy its way out of the contract without Booth's permission. Fourthly, if paragraph 5(d) required Booth's permission, then Booth could withhold such permission as a negotiating tactic, and the formula of 25 cents per case would be meaningless; Booth could always force a renegotiation of the price.

---

* See Article II, paragraph 1, of the subfranchise.

In summary, there is no inconsistency between paragraph 5(d) dealing with *termination by repurchase*, and the several provisions in the subfranchise and the master franchise dealing with *termination for cause*. Therefore we cannot accept plaintiff's argument that an inconsistency made paragraph 5(d) ambiguous. In fact, we conclude that paragraph 5(d) clearly allowed Pepsi to repurchase the contract without Booth's permission. Therefore, we reluctantly conclude that it was error to submit the interpretation of these contracts to the jury, and to admit parole evidence to aid in this interpretation. We further conclude as a matter of law that Pepsi acted within its rights and did not breach the contract. Accordingly, we grant Judgment n. o. v. to Pepsi on the breach of contract claim.

## II.  *Antitrust Claim.*

■ It is clear that the breach of contract verdict against Pepsi tainted the antitrust verdict. As stated above, the court should have entered a judgment in favor of Pepsi as a matter of law, since Pepsi did nothing more than follow the carefully negotiated repurchase provision, which Booth chose to ignore. But by allowing the jury to conclude that the repurchase provision did *not* permit Pepsi to repurchase without Booth's permission, the jury was wrongly allowed to reason that Pepsi's "violation" of the contract was itself an act of unfair competition evidencing an anti-competitive intent. Furthermore, if, as a matter of law, there was a right to repurchase, then Pepsi's and Hires' refusal to sell Hires' concentrate to Booth after January 1, 1969 could not evidence a concerted refusal to sell in violation of Sherman I, for if Booth was no longer a subfranchisee then it obviously had no right to purchase Hires' concentrate and Pepsi had no right to sell it to them.

For these reasons, we can reject plaintiff's contentions that the termination of the subfranchise agreement, and that the concerted refusal to deal were acts of unfair competition. We turn now to the other alleged acts of unfair competition.

■ The next two acts cited by plaintiff as evidence of Pepsi's alleged violation of the antitrust laws are the planting of an employee, and employee theft. The Vice-President of Pepsi recommended that Booth hire Thomas Pringle, which Booth did, for a chain store merchandising position. After ten weeks at Booth, Pringle was rehired by Canada Dry of Delaware Valley, the other defendant in this case. Similarly, there was evidence that Marvin Cohn, a key employee of Booth, was "stolen" to work at Canada Dry. However, since both employees were hired by Canada Dry, which the jury absolved of all liability in this case, we can reject plaintiff's contentions that these were found to be acts of unfair competition by the jury.

Booth next argues that resale price maintenance was used to force it to sell at low prices, much to its economic harm. However, this claim was not against Pepsi, but against Beverages, Inc., with whom it settled. Similarly, Booth argues that it was the victim of discriminatory treatment in the policies governing the sale of competitive products. It claims that it was not allowed to sell its own brand of Root Beer in competition with Hires, whereas Canada Dry was. It is clear that the national companies, Beverages, Inc., and Crush International, were policing the sales of Booth, while Beverages and Pepsi were policing the sales of Canada Dry. However, the only common actor in the two policing actions above is Beverages, with whom Booth settled. The only company to benefit from the alleged discrimination was Canada Dry, which the jury held not liable. Furthermore, there was clear evidence that the total lost profits from Booth's inability to sell its own Root Beer was far exceeded by the total profits it made from its right to sell Hires (N.T. 4/63–66).

Booth next claims Pepsi forced it to engage in considerable promotional activity to promote Hires, and then took away the franchise and gave it to Canada Dry. The argument is that Booth paid the cost and Canada Dry reaped the profits of this promotional activity. However, the evidence indicated that Booth made a substantial profit as a result of the promotion of Hires (N.T. 2/105–106, 4/45–60, 5/5, 6/15). Equally insubstantial is Booth's claim that Pepsi is liable for the alleged use of interlocking directorates to demand payment of a $90,000.00 debt. Zuckerman-Honickman was Booth's chief supplier of glass, and ceased dealing with Booth on credit, demanding payment of the $90,000.00 worth of accounts. Despite the claims of interlocking directorates, Zuckerman-Honickman is a separate corporation which was not a party to the trial, and it is distinct from Pepsi. Furthermore, the evidence indicated that the accounts receivable grew from $20,000.00 to $90,000.00 in the preceding nine months (N.T. 16/58), and that this was not Zuckerman-Honickman's first attempt to collect it, (Exhibit D–40).

Booth's final argument is that Honickman, sued by Booth in New Jersey, took an affidavit that Booth's unsatisfactory sales promotion necessitated termination of the subfranchise. However, such an affidavit occurred after the termination, and hence cannot be an anti-competitive act with respect to Booth. At most it could merely be defamatory. However, statements made in the course of a judicial proceeding are absolutely privileged and hence cannot even give rise to an action for defamation. Greenberg v. Aetna Ins. Co., 427 Pa. 511, 514, 235 A.2d 576 (1967).

For these reasons, it is clear that there was no evidence from which the jury could have found that Pepsi was liable to Booth on the antitrust claim. Accordingly, we grant Judgment n. o. v. to Pepsi on the antitrust claim.

### III. Conclusion.

In Part I we granted Judgment n. o. v. on the breach of contract claim, and in Part II we granted Judgment n. o. v. on the antitrust claim. Thus we find that Pepsi should not have been held liable to Booth at all. Accordingly, we need not resolve the issues concerning the measure of damages.